625 F.2d 918
 20 Fair Empl.Prac.Cas. 1345,
21 Empl. Prac. Dec. P 30,286
UNITED STATES of America and Equal Employment Opportunity
Commission, Appellees and Cross-Appellants,
v.
LEE WAY MOTOR FREIGHT, INC., Appellant and Cross-Appellee,
and
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, Appellee and
Cross-Appellant.
 Nos. 78-1096, 78-1097 and 78-1098.
 United States Court of Appeals,
Tenth Circuit.
 Argued May 17, 1979.
Decided Sept. 21, 1979.
 
 Richard J. Ritter, Dept. of Justice, Washington, D. C. (Beatrice Rosenberg, John D. Schmelzer and William Ng, Equal Employment Opportunity Commission, and David L. Rose and William B. Fenton, Dept. of Justice, Washington, D. C., on the brief), for appellees and cross-appellants.
 Paul Scott Kelly, Jr. of Gage & Tucker, Kansas City, Mo. (R. F. Beagle Jr., Michael J. Gallagher and John J. Yates of Gage & Tucker, Kansas City, Mo., and of counsel, Peter B. Bradford of McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, Okl., on the brief), for appellant and cross-appellee.
 L. N. D. Wells, Jr. of Mullinax, Wells, Baab, Cloutman & Chapman, P. C., Dallas, Tex., for appellee and cross-appellant.
 Robert E. Williams and Douglas S. McDowell of McGuiness & Williams, Washington, D. C., for amicus curiae Equal Employment Advisory Council.
 Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This action arises under Title VII of the Civil Rights Act of 1964, § 707, 42 U.S.C. § 2000e-6, and is against Lee Way Motor Freight, Inc. and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. The plaintiffs are the United States of America through the Attorney General of the United States and the Equal Employment Opportunity Commission, which was added in 1974 as a coplaintiff in accordance with § 707(c) of Title VII.
 
 PRELIMINARY PROCEEDINGS
 
 2
 A closely analogous cause has been before this court previously. See Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). That case, instituted by black truck drivers, alleged that Lee Way's refusal to grant requested transfers from the position of city driver to line or over-the-road driver constituted an unlawful employment practice in violation of the 1964 Civil Rights Act. The trial court rendered judgment for the defendant. This court held that the statistical evidence presented established that during the years 1964 through 1968, the company did not employ a single black line driver notwithstanding that there were between 353 and 542 men engaged in working in that category. The court's opinion also pointed out that the line driver group was substantially larger than the city driver group, and that approximately 80 percent of the white drivers were in the line category and that there were no Negro line drivers. This court said: "In short, there were no Negro line drivers; most whites were line drivers; and all Negroes were city drivers." 431 F.2d at 247. The magnitude of the statistics established a prima facie case that during this period race was a factor in staffing the two driver categories. At no time prior to the institution of the action did the company employ a Negro line driver. Two black line drivers were hired in August 1968. It was concluded that in the light of the pre-Act discriminatory hiring practices the no-transfer policy constituted a violation of § 2000e-2(a).[1]
 
 
 3
 Even though the defendant did not adopt the policy with specific intent to discriminate, we held "that the practice was followed deliberately not accidentally." The conclusion of the court, through Judge Breitenstein, was as follows:To summarize, we hold that the no-transfer policy, as applied to plaintiffs, is an unlawful employment practice within the meaning of § 2000e-2(a) because it perpetuates past discrimination, by preventing them from now having jobs which were formerly denied to them because of their race, and because it does not satisfy the business necessity test. Although the company did not adopt the policy with the intention of discriminating, the practice was followed deliberately not accidently. We conclude that the company "is intentionally engaging in an unlawful employment practice" within the meaning of § 2000e-5(g). * * * This conclusion is not at odds with the provision of § 2000e-2(j) that the Act shall not be interpreted to require preferential treatment. In our opinion the present correction of past discrimination is not preferential treatment. * * *
 
 
 4
 431 F.2d at 250.
 
 
 5
 From 1969 through June 1972, a relatively small number of black over-the-road drivers were hired. Thus in Oklahoma City out of a total of 754 such drivers, 741 were white and 11 or 1.5 percent were black. One was Hispanic. In Los Angeles, there was only one black and one Spanish surnamed American hired among 119 drivers. In Phoenix, Arizona, where 37 were hired, neither a black nor a Spanish surnamed American was hired. In El Paso, Texas, out of 35 hired, there was no black and only one Spanish surnamed American. In San Antonio, Texas, out of 11 hired, there was neither a black nor a Spanish surnamed American. There was evidence that prior to mid-1968, no black had ever been employed in the Oklahoma City terminal in any job other than the lowest paid jobs of janitor and porter. Even after Lee Way employed a few blacks in other jobs starting in 1968, it continued to follow an all-white hiring pattern for most of these positions. Out of 22 new mechanics and apprentices hired in the Oklahoma City terminal, all were white. Lee Way did not employ a black supervisor at the Oklahoma City terminal until May 1971. The first black ever employed in the management training program was not hired until February 1972. Its first black clerical employee in Oklahoma City was hired in 1968. Another black was not hired for a clerical position until November 1971, despite the fact that there were numerous hiring opportunities during this period. This pattern was present not only in Oklahoma City, but it pervaded the entire system.
 
 
 6
 Following the pretrial conference in this case, an order was entered on May 15, 1973. In it the government was required to identify each of the persons for whom it was seeking individual relief. The government was allowed to seek out potential victims of discrimination in preparation of its case. After the initial phase of the trial, the court, on December 27, 1973, entered its findings of fact and conclusions of law in which it found that Lee Way had engaged in system-wide patterns and practices of employment discrimination against blacks, which had continued up to the date that the government had filed its complaint. This was a conclusion which determined the merits of the case against Lee Way. At the same time it found that Lee Way had not discriminated against Spanish surnamed Americans.
 
 
 7
 On April 10, 1974, the court appointed Dr. Richard E. Coulson, Professor of Law at Oklahoma City University College of Law, as a Special Master, and subsequent hearings were held before Dr. Coulson. These were for the purpose of ascertaining the damages suffered by the individual aggrieved persons. Finally, however, by stipulation, testimony as to these individual claims was dispensed with and affidavits and written statements were presented in lieu thereof. The Master's report was filed on February 22, 1977, and objections were heard by the court on May 23 and 25, 1977, and June 9, 1977.
 
 
 8
 Decisions of the Supreme Court announced at the latter part of the 1977 term caused the trial court to remand the report back to the Special Master for reconsideration in light of those decisions. There were revisions by the Master in the report as a result of this.
 
 
 9
 Objections to the report on remand were heard by the court on September 12, 1977. Final judgment was entered on October 11, 1977, and the appeals and the cross-appeals were filed.
 
 CONTENTIONS BY LEE WAY ON APPEAL
 
 10
 Lee Way maintains, generally, that the court erred in the following respects:
 
 
 11
 1. In its finding and conclusion that Lee Way was engaged in a pattern and practice of employment discrimination.
 
 
 12
 2. In its finding that Lee Way used hiring standards to engage in this discrimination.
 
 
 13
 3. In finding that the awards of back pay should terminate as of April 1974, when the district court entered its preliminary injunction and interim transfer orders; that economic losses subsequent thereto could be attributable to a failure on the part of the employees to mitigate damages; that the failure of the trial court to uphold this finding was clearly erroneous.
 
 
 14
 4. In adopting the Master's report with respect to back pay awards in the following particulars:
 
 
 15
 (1) In holding that the filing of a charge with the E.E.O.C. by Marcus Jones on August 11, 1966, based on the no-transfer rule, tolled the statute of limitations for all claimants.
 
 
 16
 (2) In refusing to reduce back pay awards by the amount of necessary business expenses which the claimants would have incurred had they held line driver jobs.
 
 
 17
 (3) In awarding more vacancies in the shop than were available and in attributing 100 percent of those vacancies to blacks rather than using the percentage of blacks in the relevant hiring area.
 
 
 18
 (4) In imposing the burden of persuasion on the issue of vacancies on the company.
 
 
 19
 (5) In concluding that the company's no-transfer rule perpetuated pre-Act discrimination.
 
 
 20
 (6) In finding that some individuals who earned less than the average annual interim earnings of similarly situated class members properly mitigated their damages.
 
 
 21
 (7) In failing to require the completion of a probationary period as a prerequisite to back pay.
 
 
 22
 (8) In computing back pay awards to rejected applicants for clerical positions on the basis of the substantially higher earnings of clerical employees at the company's terminal office.
 
 
 23
 (9) In awarding back pay to one Gwendolyn Stephens Foreman based on an alleged discriminatory act which occurred subsequent to the pattern and practice.
 
 
 24
 (10) In awarding prejudgment interest on unliquidated claims and in awarding interest on amounts which would have been withheld from the claimants' earnings as taxes.
 
 
 25
 5. In failing to review the record in connection with the company's individual objections to the report of the Master.
 
 
 26
 6. In denying Lee Way a jury trial.
 
 CONTENTIONS BY THE GOVERNMENT ON CROSS-APPEAL
 
 27
 The government asserts positive contentions claiming error by the court which include the following:
 
 
 28
 1. In ruling that Lee Way's 5'7 height requirement for road drivers was required by business necessity.
 
 
 29
 2. In refusing to order affirmative hiring relief to eliminate the effects of Lee Way's discrimination against blacks.
 
 
 30
 3. In denying any relief to post-complaint victims of Lee Way's discrimination.
 
 
 31
 4. In adopting the ruling of the Master that the government may not seek relief for any individuals harmed by Lee Way's violation of its nondiscrimination obligations under Executive Order 11246.
 
 
 32
 5. In adopting the Master's ruling in which he refused to consider the claims of blacks who, subsequent to the effective date of Title VII, applied for and were denied transfers to road driving positions because of Lee Way's application of its no-transfer rule.
 
 
 33
 6. In refusing to consider the evidence that the collective bargaining agreements covering employees in Lee Way's Oklahoma City shop had been negotiated and maintained with an intent to discriminate against blacks.
 
 
 34
 7. In refusing to continue the back pay period until Lee Way offers to the claimants employment with remedial seniority in the jobs from which they have been unlawfully excluded.
 
 
 35
 8. In adopting the Master's ruling on health, welfare and pension benefits.
 
 
 36
 WHETHER LEE WAY'S NO-TRANSFER RULE WAS CONTRARY TO TITLE VII
 
 
 37
 Lee Way argues that it was error to condemn as a discriminatory policy its no-transfer rule. It is somewhat late for making this argument considering that this court's decision in Jones v. Lee Way, supra, considered this in careful detail. There the plaintiffs had argued that even though the policy was facially neutral, it was inherently illegal in that it provided a wall that excluded the black drivers from on-the-road jobs. The city driving jobs were inferior. This court has held in the early case that the application of the rule produced a present illegal effect from past discriminatory acts. The opinion said:
 
 
 38
 Although the no-transfer provision may have the same ultimate effect on both white and Negro city drivers, the differences in the factors underlying their initial employment as city drivers (the blacks had no choice) is sufficient to make the policy discriminatory as to the latter but not the former.
 
 
 39
 431 F.2d at 249. Based upon these facts and that analysis, the no-transfer rule is an unlawful employment practice under Title VII.
 
 
 40
 Lee Way would have us repudiate this holding. It argues 1) that in the absence of express proof of discrimination, the initial employment makes it impossible to conclude that this rigid system was discriminatory; 2) that under the Supreme Court's decision in United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), any practice occurring prior to the effective date of the Act is legally irrelevant and thus lawful; and 3) that, therefore, the no-transfer rule is incapable of perpetuating past discriminations.
 
 
 41
 It is contended by Lee Way that the Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), doctrine was relied on, which is that facially neutral practices are discriminatory and illegal where they have a disparate impact on one group over another. It argues that there was error since the no-transfer rule could not have a disparate impact. This, however, fails to take into account this court's ruling in Jones, supra, which clearly enunciated the facts, first, that the practice was followed deliberately and not accidentally and was therefore an unlawful employment practice, and, second, that the policy perpetuated past discrimination.
 
 
 42
 The court in Jones was careful to point out that there was actual discrimination in that case because the whites who remained in city driving jobs did so voluntarily. The blacks, on the other hand, were locked in by act of the company. Any modification of Griggs is irrelevant. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), lends direct support to our conclusion that Lee Way misused the no-transfer rule so as to carry out and perpetuate discrimination.
 
 
 43
 In Griggs, the Supreme Court expressed the object of Title VII to be removal of barriers that have operated in the past to favor an identifiable group of white employees over other employees. 401 U.S. at 429-30, 91 S.Ct. 849. The Court went on to say that practices, procedures, or tests neutral on their face cannot be maintained if they operate to freeze the status quo of prior discriminatory practices. This statement no doubt applies to pre-Act discrimination. The Court observed that the district court had found, and the finding was supported by much evidence, that prior to the enactment of Title VII the company had openly discriminated on the basis of race in the hiring and assigning of employees. 401 U.S. at 427-28, 91 S.Ct. 849. None of this is changed. Any modification of Griggs is in the area of seniority and is not here applicable.
 
 
 44
 The Supreme Court, in Griggs, unquestionably affirmed that part of the court of appeals decision which reversed the district court's finding that Title VII was to be prospective only and that the impact of pre-Act discrimination was not covered by the Act. It thus fully supported the trial court's ruling here that the no-transfer doctrine was prohibited by Title VII.
 
 
 45
 The Teamsters case does not undermine Griggs. It merely rules that bona fide seniority systems are to be protected from Title VII as a result of § 703(h) of the Act, 42 U.S.C. § 2000e-2(h).
 
 
 46
 The Court in Teamsters was careful to hold that bona fide seniority systems were valid even though there had been discrimination prior to the passage of the Act. At the same time the Court in Teamsters was equally careful to note that a neutral practice which perpetuates pre-Act discrimination is lawful only where such neutral practice involves a bona fide seniority system. The no-transfer rule does not undertake to constitute or impede a bona fide seniority system, so Teamsters is remote as far as this point is concerned.
 
 
 47
 Similarly, the Evans case does not undermine the invalidity of the no-transfer policy as it was practiced here. The holding in Evans is that when the charge is not timely filed with the Commission, the legal effect is to render the charge equivalent to an act of discrimination which occurred prior to the enactment of Title VII. This also is not germane to the present case.
 
 
 48
 In Griggs, on the other hand, the Court was concerned with the present consequences and practices which perpetuate the effects of the past discriminatory act, not the past act itself. There is not the slightest indication in Evans that the Supreme Court intended to overrule or disassociate itself from the decision in Griggs. Evans and also Teamsters merely explained the exception to Griggs which was provided in § 703 for bona fide seniority systems.
 
 
 49
 Inasmuch then as the no-transfer rule does not constitute a bona fide seniority system, the rule in Griggs is still viable, and hence the effort on the part of Lee Way to undermine it fails.
 
 
 50
 WHETHER THE COURT ERRED IN ITS FINDING AND CONCLUSION THAT
 
 
 51
 LEE WAY WAS ENGAGED IN A PATTERN AND PRACTICE OF
 
 EMPLOYMENT DISCRIMINATION AGAINST BLACKS
 
 52
 The foregoing no-transfer issue is a valuable backdrop to this present discussion. We have concluded that there was discriminatory hiring together with the use of a no-transfer policy, the purpose of which was to lock the employees into blind alley jobs with advancement precluded. This in itself is important, but also strongly evidences motive and design.
 
 
 53
 Lee Way has argued that the district court should have reasoned that the only evidence relevant as to the company's employment practices was that obtained after 1968 when the company ceased its blanket exclusion of blacks from its traditionally white jobs. This loses sight of the fact that Title VII became effective July 2, 1965. Before that there was an Executive Order which the company stipulated it was subject to and had been since 1961. Moreover, there were not only statistics offered which attested to the gross violation of the Act, but also there were numerous witnesses called who attested to individual experiences of discrimination and thus provided reality from the statistics.
 
 
 54
 Lee Way states that from January 1, 1968, to the date of trial, it had hired 55 mechanics in the Oklahoma City shop, of whom 11 were black. Careful scrutiny of this evidence, however, shows that the number was less than 11. The total during the period was actually nine. Five of these were hired subsequent to the filing of the government's complaint. One of the remaining four was the very first black mechanic hired and another was the first black apprentice mechanic hired. The remaining two were hired in March 1972 and May 1972, shortly before the filing of the complaint.
 
 
 55
 As to the office jobs, Lee Way maintains that from 1968 to the date of trial 18.5 percent of those hired in Oklahoma City for the office were black. The witness on this, Donald Owen, a Lee Way controller, testified that there were 27 regular office and clerical hirings starting in 1968 and continuing to the date of trial. Five of these were black. All but one of the blacks were employed subsequent to the filing of the government's complaint. Lee Way's Exhibit 1741 shows that from January 1, 1968 through June 1972, Lee Way hired a total of 34 regular casual office and clerical employees and only one of these was black.
 
 
 56
 Lee Way contends that a significant number of blacks were hired as road drivers during 1971. It claims that this is the first year that it kept applicant data for road drivers. It is contended that out of 1302 applicants in 1971, 312 whites (24 percent of the white applicants) were hired compared to four blacks (14 percent of the 29 black applicants).[2] Three of the four were those who were allowed to transfer to road driving jobs pursuant to the consent order entered in the Jones case. The fourth one was fired during his probationary period. There was thus minimal hiring of blacks to over-the-road jobs even after the Jones case and immediately prior to the filing of the present litigation.
 
 
 57
 There was evidence from black applicants that they were not even allowed to fill out applications when they sought road driver jobs. So, therefore, this figure, based on black applicants, becomes suspect.
 
 
 58
 It does no good to discuss these attempts by Lee Way to justify or modify the basic figures here. They speak for themselves. Furthermore, we are not writing on a clean slate, so to speak. We cannot disregard the history of this enterprise in drawing conclusions as to motive and intent.
 
 
 59
 The identical argument was made in connection with the 1970 decision of this court. At that time it was ruled that Lee Way used its classification program to carry out discriminatory policies.
 
 
 60
 Since the initial decision the Supreme Court has spoken out on virtually all of these questions. Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, (1977), decided May 31, 1977, was a suit which was also brought by the United States against the Union and against the employer. The primary question in that case was the same as that here, namely, whether the company had engaged in a pattern or practice of discriminating against Negroes and Spanish-surnamed persons who were hired as servicemen or local city drivers, which were lower paying, less desirable jobs than the positions of line drivers. Id. at 329, 97 S.Ct. 1843. Also, the question was whether the company discriminated in its promotions and transfers. The district court in Teamsters found that the government had shown that the company was engaged in a planned practice of discrimination. The evidence on this subject, the statistics and figures were themselves strong circumstantial evidence. These, as in this case, were bolstered by the testimony of individual applicants describing experiences which were quite similar to those encountered here.
 
 
 61
 The district court and the Fifth Circuit in Teamsters recognized the violations and ordered that relief be given. These decisions were cut back somewhat because of the limitations in the Act with respect to seniority, an element that is not present here. The Act, § 703(h), it was pointed out, purposefully protected so-called bona fide seniority systems and guaranteed that they would not be unlawful under Title VII. In effect, the Supreme Court said that the presence of a seniority system is not illegal merely because the company had discriminated before Title VII was enacted. The holding was that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested rights to continue to exercise those rights, even at the expense of pre-Act discriminatees." 431 U.S. at 353-54, 97 S.Ct. at 1864. The trial court in this case took account of this aspect of the case, however, and fashioned the relief that was entered, so it is unnecessary to consider the seniority problem here.
 
 
 62
 In conclusion, we hold that the findings and conclusions with respect to the conditions in the various areas of employment are fully supported by the evidence. Some of the relevant findings are set forth in Appendix I and II. These findings are not only supported by the evidence, they are supported by the law, for the practices which were found to exist here were specifically condemned by the Supreme Court in Teamsters v. United States, supra. This is fully apparent from the discussion above.
 
 
 63
 The foregoing are merely examples of the extensive, specific and pervasive violations which are in the district court's findings and in the Master's report which has been adopted by the district court. These provide support for the statements made and the determination reached. All of this supports our conclusion that Lee Way has systematically engaged in a pattern and practice of discrimination on account of race. This continued at least until the date that the government filed suit. There is some evidence that this practice continued after the date on which the suit was filed. Undoubtedly Lee Way made some improvements, but they have fallen far short of being full-scale.
 
 THE ISSUE OF MISUSE OF EMPLOYMENT STANDARDS
 
 64
 We now turn to Lee Way's claim that the trial court erred in concluding that Lee Way misused its minimum employment standards in that it had turned these against black applicants.
 
 
 65
 Lee Way argues that relief should have been withheld from road driver applicants based upon this theory of the evidence. However, the trial court concluded that different approaches were taken toward black applicants than white applicants as to compliance with these employment standards. We consider the question whether this was a routine approach of Lee Way.[3]
 
 
 66
 The evidence established that the minimum employment standards were applied in a strict way to black applicants. At the same time a significant number of white applicants were hired notwithstanding that they failed to satisfy minimum requirements. The road test was especially a factor that entered into this because whether a person passed was within the discretion of a supervisor for Lee Way. All supervisors were white. The proof was that blacks who had passed the road test on the same or similar equipment of other companies failed when Lee Way gave the test. One instance is described in which a supervisor deliberately turned off a valve so that the brakes locked. This prevented the black applicant from passing the test. The trial court concluded that this discrimination illegally occurred. There is ample evidence in the record to support the trial court's conclusion that there was regular discrimination during the relevant period, 1968-72, based upon the enforcement of the minimum employment standards.
 
 
 67
 Lee Way argues that there were only four percent of the white applicants who were employed notwithstanding failure to meet all of the minimum standards. This, however, falls short of proving nondiscrimination. There was inadequate information as to black applicants. Lee Way, it will be remembered, did not, on some occasions, allow blacks to fill out applications in many instances. These people were told that there were no vacancies when in truth there were. Sometimes the minimum qualifications prevented blacks from completing the applications. These standards were often waived for white applicants. There is evidence to establish that approximately 18 percent of the whites hired as road drivers in Oklahoma City failed to satisfy all of the requirements. Comparable statistics for blacks are difficult to ascertain because so few were hired as road drivers during the years in question.[4]
 
 
 68
 To use a four percent limit in fashioning relief would impose a maximum quota on the victims of discrimination who should be afforded relief. This would overlook the object that all of the victims are entitled to be made whole. The fact remains that where a black person has been denied employment as a result of discrimination, he is entitled to relief. Failure to hire him because he failed to meet all of the requirements is not justifiable where there are white persons being hired even though they fail to meet the very same requirements. The district court has detailed its findings with respect to this manner of discrimination. There is evidence in support of the court's findings.
 
 
 69
 THE ISSUE OF THE TERMINATION DATE FOR BACK PAY LIABILITY
 
 
 70
 The trial court rejected the Special Master's ruling as to the date of termination of awards of back pay. The Master set that date at April 30, 1974. On the other hand, the trial court took the position that the proper termination date for the award should be September 12, 1977. The 1974 date was that on which the court ordered preliminary injunctions and certain interim orders based upon its finding that Lee Way had been guilty of a pattern and practice of discrimination. The court ordered back pay with interest at the rate of six percent to and including September 12. This was the date upon which the court finally resolved all matters affecting relief for the individual claimants, "unless the Master in either of his Reports has specifically determined that back pay should end at some earlier date for an individual claimant based upon the facts of that individual's claim."
 
 
 71
 The government sought to have the outside time limit coincide with the time when Lee Way offered a job to each claimant with remedial seniority.[5] The court then proceeded to set up a formula for computation of the back pay. Included in the court's decree was an order for the payment of Social Security taxes. It also provided for withholding federal, state and local taxes and the payment by the employee of his or her part of the Social Security tax. The effort is to make the aggrieved persons whole insofar as possible, and so it is this goal that is sought. This back pay is regarded as equitable relief and as an effort to restore the injured persons to their rightful place in the economic system. Pearson v. Western Electric Co., 542 F.2d 1150 (10th Cir. 1976).[6]
 
 
 72
 The courts of appeal are in general agreement that the formula of computation and the determination of recipients are matters within the discretion of the district court. See Thornton v. East Texas Motor Freight, 497 F.2d 416, 421 (6th Cir. 1974). The Ninth Circuit has taken a similar view. Kaplan v. International Alliance of Theatrical and State Employees, 525 F.2d 1354, 1362-63 (9th Cir. 1975). Thornton, supra, held, in addition, that the commencing and ending dates to be used were matters within the discretionary authority of the court.
 
 
 73
 It has also been said that the complexity of the compensation problem justifies the grant of the broad discretion. See Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975).
 
 
 74
 The Second Circuit has also followed this approach. Equal Employment Opportunity Commission v. Enterprise Association, Steamfitters, Local No. 638, 542 F.2d 579 (2d Cir. 1976), cert. denied sub nom. Rios v. Enterprise Association Steamfitters, Local No. 638, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). To the same effect is Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).
 
 
 75
 In E.E.O.C. v. Enterprise Association Steamfitters, Local No. 638, supra, the Second Circuit also ruled that the date of the order providing for injunctive relief was not the proper one to use for the termination date because the entry of the injunction did not instantly reverse the condition. See 542 F.2d at 590. Another court concluded that the employee should be awarded back pay from the time he or she suffered the injury to the time when remedial relief was actually realized. Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).
 
 
 76
 The Fifth Circuit has also held that the termination date is when the discrimination is remedied. See James v. Stockham Valves and Fittings, 559 F.2d 310, 358 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). The basis for the court's award was that the long-term resistance by the company justified this.
 
 
 77
 The Fourth Circuit is, as noted above, a leading proponent on the use of "front pay." See Patterson v. American Tobacco Company, supra, and White v. Carolina Paperboard Corp., 564 F.2d 1073 (4th Cir. 1977). The court there said:
 
 
 78
 (B)ack pay in Title VII cases may be supplemented, in the district court's discretion, "by an award equal to the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when the employee can assume his new position.
 
 
 79
 564 F.2d at 1091 (emphasis added).
 
 
 80
 It is thus seen that the trial court did not abuse its discretion in setting the termination date that it set because, as is noted in the cases, a long period of time passes before the injured employee achieves the position that he is entitled to have.
 
 
 81
 Lee Way's argument is that the delay resulting from the lengthy proceedings ought not to be laid at its doorstep. This must be rejected under NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969). There the Supreme Court noted the broad remedial purposes of back pay awards under the analogous National Labor Relations Act. The purpose is to render the aggrieved employees whole and restore them to the economic status that they would have enjoyed had it not been for the discriminatory acts against them. The Court continued that the "Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." 396 U.S. at 265, 90 S.Ct. at 421.
 
 
 82
 We must also reject Lee Way's argument that the cutoff date of the Master in 1974 was a finding of fact. On the contrary, it is a mixed question, and it was certainly within the power of the trial court in accordance with its view of the evidence and the law. It has been held to be a question of law. See Comacho v. Colorado Electronic Technical College, Inc., 590 F.2d 887, 889 (10th Cir. 1979).
 
 
 83
 The present case is an aggravated one and the court would have been subject to criticism if it had adopted the termination date of the Master for the reason that this would fall far short of achieving equitable relief and rendering the employee whole.
 
 
 84
 THE QUESTION WHETHER THE STATUTE OF LIMITATIONS SHOULD HAVE
 
 
 85
 TAKEN HOLD TWO YEARS PRIOR TO THE GOVERNMENT'S FILING OF
 
 
 86
 SUIT IN 1972 FOR PURPOSES OF BACK PAY OR, WHETHER, UNDER THE
 
 
 87
 DOCTRINE OF LACHES, IT SHOULD HAVE BEEN LIMITED IN A SIMILAR WAY
 
 
 88
 Originally the Master had taken the position that the starting date for recovery where it was merited in an individual case was the effective date of Title VII, July 2, 1965. This result was reached on the basis of the date of the original claim filed with the Commission by the individuals in the original suit, Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970). The filing of the claim by Hodge, Nickles, Irving and Jones was held to have effectively tolled the running of the statute. On this the trial court said:
 
 
 89
 Lee Way's objection that the Special Master erred by ruling that the statute of limitations for recovery of back pay by claimants was tolled for all purposes by the filing of the "Marcus Jones" charges with the EEOC against Lee Way and, that as a result, the back pay period extended to July 2, 1965, was first sustained by the Court at the time this objection was orally argued on May 25, 1977. At that time the Court ruled that back pay could only be recovered from a point two years prior to the filing of the Government's complaint, i. e., June 22, 1970. The Court subsequently entertained a motion filed by the Government for reconsideration of this bench ruling. In an order dated August 8, 1977 the Court vacated its bench ruling and reinstated the ruling of the Special Master that the beginning date for Lee Way's back pay liability is July 2, 1965, and that the statute of limitations was tolled for all purposes by the filing of the "Marcus Jones" charges with the EEOC.
 
 
 90
 The question is whether this ruling of the court was correct. Lee Way maintains that the court should have applied the two-year Oklahoma state statute of limitations or, alternatively, the two-year cutoff under federal law, extending back from the date on which the government filed suit, citing United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973). Georgia Power noted in a footnote[7] that § 706(g) of the Act, which provides that back pay liability may not commence on a date more than two years before the charge was filed with the EEOC, was irrelevant to the proceedings there involved (a pattern or practice suit under § 707), and held that the court should look to the most closely analogous state statute. The court in Georgia Power also noted that where a complaint was filed with the EEOC, and a subsequent suit is based upon the same pattern or practice of discrimination as alleged in the complaint, Title VII's policy requires the tolling of the statute of limitations "as to all potential claimants who rely upon the same act of discrimination as the basis for their right." Id. at 925.
 
 
 91
 In Albemarle Paper Company v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), it was noted that the Congress considered several proposals which would have limited the power of the court to award back pay. They rejected these so as to make possible the fashioning of the most complete relief possible. See 422 U.S. at 421, 95 S.Ct. 2362. Among the provisions rejected is one that would have "limited back pay liability to a date two years prior to filing a complaint in court." The Congress instead adopted a substantially more liberal limitation, that is, a date two years prior to filing a charge with the EEOC. 422 U.S. at 420 n. 13, 95 S.Ct. 2362, 2373 n. 13.
 
 
 92
 This Albemarle statement was followed by the Second Circuit in a pattern and practice case in which it refused to limit back pay to a date two years before the government filed suit. See Equal Employment Opportunity Commission v. Local 638, 401 F.Supp. 467 (S.D.N.Y.1975), modified on other grounds and aff'd, 532 F.2d 821 (2d Cir. 1976). See also Equal Employment Opportunity Commission v. United Air Lines, Inc., 10 EPD P 10,271 (N.D.Ill.1975), modified on other grounds and aff'd, 560 F.2d 224 (7th Cir. 1977), cert. denied, 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 764 (1978), and see 42 U.S.C. § 2000e-6(e), which provides:
 
 
 93
 Subsequent to March 24, 1972, the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 of this title (wherein § 706(g) is located).
 
 
 94
 (Emphasis added.)
 
 
 95
 The court's decision adopting the ruling of the Master, we conclude, is the better course of action. This is a pattern or practice suit based upon the same practices which formed the bases for complaint with the EEOC. Thus, § 706(g), as amended, applies and the limitations period commences two years prior to the date that the charge was filed. The charge here was in the form of a letter signed by the four black city drivers, dated August 11, 1966. This was a complaint that the company had discriminated against them by operation of the no-transfer rule and "(d)ue to the fact that the company has not here-to-fore hired Negro Line Drivers . . . ." The Commission treated the charge as having been filed on August 11, 1966. Thus, it cannot be questioned that the charge filed by the four men described the same conduct that the government described in 1972 as constituting a pattern or practice of discrimination. The company did not lack notice as to which of its practices formed the nucleus for the complaint, and in view of Albemarle Paper Co., Duke Power Co., and EEOC v. United Air Lines, Inc., the contention of Lee Way that the district court improperly applied § 706(g) must fail.
 
 
 96
 The next resort is to the state statute of limitations.
 
 
 97
 Occidental Life Ins. Co. v. Equal Employment Opportunity Commission, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), furnishes some solution to the problem. It held, in general, that there do not exist time limits as against the EEOC's right to bring an action under Title VII. The Ninth Circuit had ruled out the applicability of the 180-day provision in the Act, § 706(f)(1), 42 U.S.C. § 2000e-5(f)(1), and also it denied the application of any state limitations act. E.E.O.C. v. Occidental Life Ins. Co., 535 F.2d 533 (9th Cir. 1976), aff'd, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). The Supreme Court in Occidental said that the EEOC was not required to go through all of the administrative efforts prescribed in the Act and at the same time file a lawsuit within 180 days. The Court said that the language did not call for such a construction. 432 U.S. at 361, 97 S.Ct. 2447.
 
 
 98
 The Supreme Court in the same case dealt with the issue of state limitations acts. It recognized the rule that state limitations acts frequently come into play where there is no similar federal act, but held that this rule would be entirely inconsistent with the goals of the Act in that it would hamper the agency's efforts. See 432 U.S. at 368, 370-71, 97 S.Ct. 2447.
 
 
 99
 Also rejected is the Lee Way contention that the doctrine of laches operated to bar the government in this case.
 
 
 100
 This matter has been taken up previously by the circuits. The various factors applicable were brought in these cases. See Albemarle Paper Co. v. Moody, supra; Bernard v. Gulf Oil Co., 596 F.2d 1249 (5th Cir. 1979); E.E.O.C. v. North Hills Passavant Hospital, 544 F.2d 664 (3d Cir. 1976). No doubt it would be possible to have a laches defense, but the cases recognize the great difficulty involved inasmuch as these cases are complex and call for painstaking preparation, all of which takes time. Also, the defendants were not exactly cooperative. They fully exercised their rights and then some, all of which uses time.
 
 
 101
 The trial court summed up the problem in the case at bar when it said in the course of the trial:
 
 
 102
 Do you have in fact factual situations in any of these cases (cited by Lee Way in argument), facts such as were present here where during the time that the postal authorities were attempting to enforce this law, defendants as Lee Way did here, repeatedly covered up, hid, and misrepresented facts to the postal authorities and tell people, "No, we have got no vacancy." And then add to the illustration I made yesterday, add to the EEOC man who had talked to the applicant and said, "Why, they got a vacancy at Lee Way." You are mistaken. I have been out there. They already told me they don't have any." He said, " Well, you take this note from me out there." And then they hired him like that. But they had continuously lied to black applicants until it got right down to the lip law. Now, can you find any instance where the doctrine of laches has been applied under factual situations such as that?
 
 
 103
 In overruling the defendant's objection, the court further said:
 
 
 104
 From evidence I heard four years ago, there just is no question in my mind that back during this period of time that any Black who tried to enforce his human rights and the word got back to Lee Way, there would be some way that he would regret it. So laches, that is absolutely out and more especially so in view of the vicious inhuman treatment that was uniformly given to all the Blacks that came in contact with Lee Way.
 
 
 105
 These expressions find support in the record and fully answer the present contention.
 
 
 106
 THE ARGUMENT THAT LEE WAY WAS ENTITLED TO REDUCTION IN THE
 
 BACK PAY AWARD FOR ORDINARY ROAD EXPENSES
 
 107
 Lee Way is here contending that had the drivers been on the road they would have had to pay for meals and lodging and so there should be a 20 percent reduction in the back pay awards for such expenses. This was rejected by the trial court. The evidence in support of this request is meager.
 
 
 108
 The district court adopted the Master's analysis that the 20 percent was arbitrary and too hypothetical to apply across the board. The only evidence offered by Lee Way involved two of its road drivers.
 
 
 109
 Unquestionably the 20 percent was not applicable generally, and any effort by the court to work out an acceptable figure would be impossible. True, there are cases which recognize that where business expenses are substantiated by the evidence, this should be recognized. However, we are of the opinion that the trial court's refusal to allow these deductions in the instant case was not an abuse of discretion.
 
 
 110
 THE ISSUE WHETHER TOO MANY APPRENTICE MECHANIC VACANCIES
 
 WERE ASSIGNED TO BLACKS
 
 111
 Lee Way here says that between July 1965 and June 1972, only eight whites who were hired as apprentice mechanics became journeymen. From that it is argued that it was inappropriate to award vacancies to 15 blacks. However, when the evidence is sifted, it appears that only six blacks were awarded vacancies. Thus, the number of whites hired exceeded the number of blacks assigned to fill these vacancies.
 
 
 112
 Additionally, Lee Way maintains that no more than one of the vacancies ought to have been awarded to a black. Lee Way argues that in a colorblind environment of 8.5 percent of blacks, which is the population figure for the Oklahoma region, only one vacancy should be available. Thus, they would use this percentage as the maximum basis for giving relief. This contention is at odds with Albemarle, which holds that all of the victims are to be made whole. In the absence of evidence of business necessity or another non-discriminatory basis for refusing to hire the six blacks in question, we perceive no inequity in requiring that Lee Way hire all six.
 
 
 113
 In reaching a conclusion on this subject one must remember that the government has the burden of establishing a pattern and practice of employment discrimination, but, having done so, as is true here, it is assumed that during the period in question the policy was a continuing one.
 
 
 114
 In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court said that once a pattern and practice of discrimination had been established, the inference that the employer is pursuing such a policy flows from the rejection of an applicant. Id. at 359 n. 45, 97 S.Ct. 1843. The Court said:
 
 
 115
 As in Franks, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons. See 424 U.S. (747) at 733 n. 32, 96 S.Ct. 1251 (47 L.Ed.2d 444).
 
 
 116
 Id. at 364, 97 S.Ct. at 1868.
 
 
 117
 So, therefore, we conclude that the argument of Lee Way that too many blacks were assigned to the mechanical apprentice vacancies is without merit. There is a dearth of evidence on the part of Lee Way that the rejections were for lawful reasons.
 
 
 118
 THE ACTION OF THE MASTER, APPROVED BY THE COURT, WHICH
 
 
 119
 SHIFTED THE BURDEN TO LEE WAY ON THE ISSUE OF THE
 
 AVAILABILITY OF VACANCIES FOR THREE CLAIMANTS
 
 120
 The Master shifted the burden of proof on some specific issues to Lee Way, but did not shift the burden of persuasion to Lee Way. The claimants here were Audrey Daniels and James Hill, who were awarded road driver vacancies, and John Crouch, who was awarded an apprentice mechanic vacancy. Teamsters recognizes the difficulty of proof for the government where the only possible verification can be obtained from the records of the company. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 359 n. 45, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Those records were incomplete because the applicant was not always applying for specifically announced vacancies. Lee Way did not accept applications unless there were such vacancies or such vacancies were anticipated. The record shows also that Lee Way did not necessarily give out accurate information to the applicants. Lee Way might tell a black that there was no vacancy when in fact Lee Way was hiring. All of this justified the shifting of the burden of proof. The burden of proof did not shift automatically. It shifted only after proof that Lee Way had engaged in a pattern and practice of employment discrimination against blacks and that individual claimants had unsuccessfully sought certain jobs at Lee Way. Shifting the burden of proof to the company is not inappropriate in the face of evidence such as was present here. This was not a shift of the burden of persuasion.
 
 THE STANDARD FOR MITIGATION OF DAMAGES
 
 121
 It was determined below before the Master and ultimately the court whether each of the claimants had diligently sought to mitigate damages. Lee Way urges that the appropriate standard for mitigation was not followed; that the court should have used either the "best man" or an "average man" approach. We are of the opinion that the district court did not apply an incorrect standard nor did it abuse its discretion. Indeed Lee Way has not argued that the factual findings pertaining to any particular claimant are clearly erroneous.
 
 
 122
 The "best man" theory of mitigation imputes the interim earnings of the most successful claimant to those claimants who are similarly situated. Thus, the standard is that of the most successful claimant. He alone has exercised reasonable diligence.
 
 
 123
 The "average man" approach imputes the average of the interim earnings to those claimants whose interim earnings were below average. Thus, any claimant who earned less than the average is conclusively held to have not exercised reasonable diligence. Both the "best man" and the "average man" theories were rejected. Instead the inquiry was whether each claimant had exercised reasonable diligence in mitigating damages.
 
 
 124
 The statute provides that back pay awards are subject to reduction for the amount of interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against. 42 U.S.C. § 2000e-5(g) (1976). Once a violation has been demonstrated and back pay has been awarded, the employer has the burden of showing that the discriminatee did not exercise reasonable diligence in mitigating the damages caused by the employer's illegal actions.[8] Lee Way did not satisfy its burden. However, it seeks to contest some or many of the finder of fact's determinations on mitigation. Thus, it would evaluate the individual's circumstances and efforts to mitigate by the success of the group.
 
 
 125
 Lee Way finds some support for its "best man" theory in Jurinko v. Edwin L. Wiegand Co., 331 F.Supp. 1184 (W.D.Pa.1971). In that case back pay was awarded to two women. One of these claimants had not worked during the period of the award so the court used the interim earnings of the other claimant as a measure of the amount earnable with reasonable diligence by the idle claimant. The court thus appears to have concluded that the one claimant failed to mitigate damages before it used the interim earnings of the other claimant. It is a questionable approach and it is not authority for the proposition that lower interim earnings must necessarily indicate a failure to mitigate nor is it a strong precedent for a "better woman" theory in light of its subsequent history.[9]
 
 
 126
 Also relied on by Lee Way is Slack v. Havens, 8 EPD P 9492 (S.D.Cal.1973), aff'd on other grounds, 522 F.2d 1091 (9th Cir. 1975). The district court in Slack had relied on Jurinko to support a "best man" approach to the mitigation efforts of the four claimants.
 
 
 127
 It is to be noted that both of these cases used the "best man" theory only on a limited number of claimants. It would have less validity if it were being applied to a large number. The individual approach, we conclude, considering as it does the efforts of each successful claimant to mitigate damages, is more equitable than the most successful employee approach which presumes that reasonable diligence was exercised by the most successful interim employee only.
 
 
 128
 Lee Way relies on Masco v. United Airlines, Inc., 13 EPD P 11,578 (W.D.Pa.1976), for the "average man" approach. This case was reversed on appeal and remanded with instructions to dismiss for failure to file a timely claim. Masco v. United Airlines, Inc., 574 F.2d 1127 (3d Cir. 1978).
 
 
 129
 The government cites for the individual approach the case of NLRB v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307 (D.C.Cir.1972). It was there said:
 
 
 130
 Where an employer with a back pay liability contends that the discriminatees in question did not all make the required effort to mitigate their damages, the willful idleness issue must "be determined with respect to each employee considering the record as a whole." (Citation omitted.) The particular facts concerning each separate individual must be considered by the Board. (Citation and footnote omitted.) This individualized, rather than group, approach is dictated by the nature of the mitigation rule which is generally recognized today. The merit of an individualized approach in a judicial matter is self-evident.
 
 
 131
 Id. at 243, 472 F.2d at 1318.
 
 
 132
 The rationale of this case is very appealing. A claimant is required to make only reasonable exertions to mitigate damages, and is not held to the highest standards of diligence. It does not compel him to be successful in mitigation. It requires only an honest, good faith effort.
 
 
 133
 The court below used an average approach to obtain interim earnings for those claimants who failed to exercise reasonable diligence in mitigating damages. The use of an average is deemed appropriate where it has been determined that the claimant failed to exercise reasonable diligence. This is far different from automatically concluding that a claimant whose interim earnings are below average failed to mitigate. The trial court may exercise its discretion in determining whether a claimant should have or could have exercised more diligence in reasonably seeking other employment.[10] The use of an individual approach to evaluate mitigation in this case did not constitute an abuse of the court's discretion.
 
 
 134
 LEE WAY'S CONTENTION THAT A PROBATIONARY PERIOD WAS A
 
 NECESSARY PREREQUISITE TO RECEIVING BACK PAY
 
 135
 The Master and ultimately the court refused to require such a period. On the other hand, back pay was awarded for the positions the claimants were seeking. Lee Way has not even suggested that these factual findings were clearly erroneous, nor has it brought forward any evidence to indicate that a particular claimant's pursuit of employment or advancement at Lee Way was not made in good faith. The imposition of the probationary period could invite harassment or tactics which are distasteful in order to encourage a claimant to leave before the probationary period and hence to forfeit the back pay award. This would also allow Lee Way to delay paying some of the back pay awards.
 
 
 136
 We are not told how the claimants would be affected by the proposed probationary period. The Master ruled that under certain circumstances a claimant would not even have to accept an offer of employment from Lee Way in order to receive a back pay award. He said:
 
 
 137
 To be entitled to any back pay relief a claimant found entitled to back pay and a future vacancy must accept that vacancy if offered within 180 days of the District Court's final judgment unless the claimant can show that his refusal to accept the vacancy is the result of age, illness, retirement, good faith change in job conditions, subsequent employment elsewhere, or other similar reasons for declining a vacancy.
 
 
 138
 The probationary period would not work in connection with claimants who, for valid reasons, refused an offer of employment by Lee Way. The probationary period has attracted little interest in the decided cases. It has been, for example, required in a class action suit where it was established that the vast majority of male applicants for the job of flight attendant would not have qualified or have been hired regardless of sex discrimination. Diaz v. Pan American World Airways, Inc., 346 F.Supp. 1301, 1307, 1309 (S.D.Fla.1972). In this case there is no controversy concerning a claimant's qualifications for an assigned vacancy. Moreover, the successful claimants do not exceed the available vacancies.
 
 
 139
 Our conclusion is that the trial court did not abuse its discretion by refusing to require a lengthy probationary period as a prerequisite to the receipt of any back pay by a claimant.
 
 
 140
 VALIDITY OF THE BACK PAY AWARD TO CLERICAL PERSONNEL
 
 
 141
 Lee Way challenges the amounts of these awards. It claims that they are based entirely on the average earnings of clerical help at its terminal office. The argument is that the awards should instead be based on the average earnings at the Oklahoma City general office since the claims in issue had to do with the general office. However, in its reply brief, Lee Way says that the back pay should be based on the earnings of both the general and terminal offices' clerical help.
 
 
 142
 The Master's finding, approved by the court, was that both the general and the terminal office averages were considered in the computations. So, the whole controversy seems baseless and pointless. It would be futile to send the case back with directions to apply the averages in both offices.
 
 
 143
 There are four clerical help individuals who were claimants. Some of the vacancies assigned were, contrary to Lee Way's claim, in the terminal office. Two of these were Gwendolyn Stevens Forman and George W. Ware, who were assigned to the terminal office. A third, Leeha Tucker McCormick, was assigned to the first vacancy for which the occupant was not clearly more qualified. The record does not disclose whether it was a general or terminal office vacancy. The fourth one, Juanita Collins, was subject to a special formula because one of the injuries which she is shown to have suffered was retaliation by Lee Way because of her testifying in this lawsuit.
 
 
 144
 From the record we are not able to say whether or not terminal earnings averaged higher than the general earnings. It is sufficient, however, to point out that Lee Way has not demonstrated that the district court's findings constituted clear error or an abuse of discretion. Remand on a relatively petty issue such as this would only serve to further delay the final outcome of a case that has, due to its scope and extent and the pervasiveness of the violations, taken far too much time already.
 
 
 145
 ALLEGED INVALIDITY OF THE AWARD TO GWENDOLYN STEVENS FORMAN
 
 
 146
 Lee Way's point here is that there is no entitlement because the alleged racial discrimination against her did not take place until after this suit was filed. Claims which arose after the suit was filed are said to be outside the court's jurisdiction because the pattern and practice ended on the date of filing.
 
 
 147
 The Forman timetable shows that she first applied for a position on June 12, 1972. The action was filed June 22, 1972. The first vacancy for which she was qualified occurred August 29, 1972. Back pay was awarded from August 29, 1972.
 
 
 148
 The question comes down to whether the court had jurisdiction to consider this particular violation given the fact that the trial court had established a cutoff date as of the date of the filing. The trial court's action in setting a date did not, of course, bring about a law-abiding condition.
 
 
 149
 We are unable to conclude that the trial court violated or abused its discretion in taking up this particular claim, particularly in view of the fact that the application was filed prior to the date that the court had set. As we view it, the court had jurisdiction of all of the subject matter. The court was free to make exceptions for circumstances where justified. Here, in effect, the act of discrimination related back to the date of filing the application. Indeed, why the judge set any date is not explained in the record, and there is no reason why he should have.
 
 THE INTEREST COMPUTATION
 
 150
 Lee Way's contention is that the court erred in awarding interest prior to the entry of judgment. Title VII does not specifically provide for this. The Master's computation was based upon the year in which the earnings would have been received had it not been for the discrimination. There is no dearth of precedent in this area. NLRB v. American Compress Warehouse, 374 F.2d 573, 576 (5th Cir. 1967); Vant Hull v. City of Dell Rapids, 465 F.Supp. 1231, 1233 (D.S.D.1979); Davis v. Jobs for Progress, Inc., 427 F.Supp. 479, 483 (D.Ariz.1976); Laffey v. Northwest Airlines, Inc., 374 F.Supp. 1382, 1389 (D.D.C.1974), modified on other grounds, 185 U.S.App.D.C. 322, 567 F.2d 429 (D.C. Cir. 1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); St. John v. G. W. Murphy Industries, Inc., 11 EPD P 10,651 (W.D.N.C.1976); Isis Plumbing & Heating Co., 138 NLRB 716 (1962), set aside on other grounds, 322 F.2d 913 (9th Cir. 1963).
 
 
 151
 Lee Way argues that such an award is contrary to Oklahoma law. However, this case does not arise under Oklahoma law. So, even if Oklahoma law does apply, and it has not been demonstrated that it does, we are unable to say with certainty that it prohibits the award of such interest. Basically Lee Way is advancing the proposition that wherever the claim is unliquidated, interest is not allowable because the debt does not have any existence until it is declared by the court and made liquidated by judgment. This, however, has not been observed in these cases or in NLRB cases which are looked to in determining an award of back pay for violations.
 
 
 152
 As an alternative, Lee Way would have us reduce the earnings by 33 percent for payroll taxes before computing the interest. This was not presented to the Master at the time that the interest question was being considered. The whole argument was made to the district court, but it was rejected. For one thing, the record is vague as to how Lee Way arrives at 33 percent.
 
 
 153
 In view of the inability of Lee Way to present authority for this seemingly arbitrary deduction, we are unwilling to give effect to their request. Considered from an equitable standpoint, the argument is not persuasive.
 
 LEE WAY'S REQUEST FOR A JURY TRIAL
 
 154
 We have examined the further argument of Lee Way that it was entitled to a jury trial on the issues of discrimination and damage.
 
 
 155
 This must also be rejected. As late as June 1979, the Supreme Court ruled that no such right exists in cases of this nature. See Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The fact that this is equity jurisdiction is an adequate basis for holding that a jury trial is not required. As a practical matter, a jury would have had a long and troublesome career had it been chosen to hear and determine this case.
 
 
 156
 LEE WAY'S SUGGESTED REMAND FOR THE DISTRICT COURT TO REVIEW THE RECORD
 
 
 157
 We have also considered the Lee Way contention that the case ought to be remanded for the purpose of compelling the district court to review the record in connection with the company's specific objections to individual factfindings by the Master.
 
 
 158
 Rule 53(e)(2) of the Federal Rules of Civil Procedure provides that the district court, in an action tried without a jury, "shall accept the master's findings of fact unless clearly erroneous." Thus, it is not necessary for the trial court to scrutinize for possible error in the Master's report. As a practical matter, a word for word consideration of the report and of the evidence in all likelihood would not change the result. Under our adversary system this is not necessarily the best and essential way to do it. The trial judge heard the witnesses when he determined the liability issue. In doing so he became acquainted with the essence of this case. He also undoubtedly considered carefully the objections made by the defendant in the light of the evidence that he had heard and the evidence that was taken by the Master.
 
 
 159
 There is one further factor. This is not a close case. The violations on the part of Lee Way are palpable. This is not a case that had to be determined on the basis of statistics and inferences flowing from them. Here there was evidence of express discrimination. It was pervasive and continuous. So, the case does not call for a remand with instructions to the court to check over this tremendous record. This would mean another one to two year delay in the entry of final judgment. This request must then also be refused.
 
 
 160
 THE JOINT CROSS-APPEAL BY THE UNITED STATES AND THE EEOC
 
 
 161
 As we noted, the trial court ruled against the government on a number of its contentions and these are cross-appealed.
 
 
 162
 THE RULING THAT THE LEE WAY HEIGHT REQUIREMENT OF 5'7 FOR
 
 
 163
 ROAD DRIVERS WAS JUSTIFIED BY BUSINESS NECESSITY
 
 
 164
 The government argues that the 5'7 height requirement had a disparate impact on Spanish surnamed Americans. The government presented evidence showing that on the average, Spanish surnamed males are shorter than whites.
 
 
 165
 The district court had previously held that Lee Way had discriminated against blacks by stricter enforcement of the height and other employment requirements, against blacks as opposed to whites. The contention was not advanced by the government that the height standard was more strictly enforced against Spanish surnamed Americans.
 
 
 166
 The court not only found that this physical standard was dictated by business necessity, it also found that it had not been used by Lee Way in any discriminatory manner. This so-called business necessity is based on the need for a driver to be able to readily reach the pedals and operate the controls. Once the government established that the height requirement had a discriminatory impact on Spanish surnamed Americans, the burden shifted to the employer, so it is argued, to show that the requirement had a manifest relationship to the employment in question.
 
 
 167
 The Supreme Court held in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), that practices which are fair in form, but discriminatory in operation, are proscribed if they "cannot be shown to be related to job performance." "The touchstone is business necessity." Id. at 431, 91 S.Ct. at 853.
 
 
 168
 Lee Way's evidence consisted of two employees stating that the height requirement was job related or dictated by business necessity. One employee said that a certain minimum height was necessary to operate in the cab and to apply the brakes in an emergency. Another said that a certain height was necessary in order for the driver to reach all of the pedals including the brakes. This evidence, plus the judge's observations of a representative cab used by Lee Way, constituted the basis for the decision.
 
 
 169
 There was contrary evidence that belies the company's testimony, and that evidence is Lee Way's hiring of at least 16 white men who were less than 5'7 tall. One of these, who was 5'41/2 , said that his height had never been a handicap in operating the equipment. He had years of accident-free driving and had received safe driving awards. The government also showed that no such height requirement is imposed by the Department of Transportation. Lee Way did not present evidence correlating height with safe driving or strength. A standard such as this, which has a disparate impact, must be justified as necessary for safe and efficient performance in order to survive a Title VII challenge.[11]
 
 
 170
 It has been held by the Supreme Court that height and weight requirements in the case of prison guards were not justified where the employer failed to produce evidence correlating height and weight with the requisite amount of strength thought necessary for good performance. Dothard v. Rawlinson, 433 U.S. 321, 331, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Even where studies are conducted, they are not necessarily conclusive and can be questioned.[12] Where the studies failed to include data on the strength of police officers under the height requirement or on the suspect resistance encountered by shorter officers, the usefulness of the studies was questionable. Blake v. City of Los Angeles, 595 F.2d 1367, 1379-83 (9th Cir. 1979).
 
 
 171
 The testimony in question, which does not seek to correlate height with job performance, renders difficult the justification of a disparate impact on Spanish surnamed Americans. Moreover, if Anglos less than 5'7 tall could perform safely and efficiently for Lee Way, there is no reason to suppose that Spanish surnamed Americans could not do likewise. We are not saying that minimum height requirements are not justifiable. This particular one is, however, suspect, and we see no escape from a further hearing on this question by the trial court.
 
 
 172
 This issue is then remanded with directions to the trial court to examine more fully the issue of disparate impact and particularly the aspect of business necessity. For example, it would help if a reasonably strong individual less than 5'7 tall could conduct a test drive. We are merely saying that some additional evidence should be taken which would serve to provide a more conclusive answer to this question.
 
 
 173
 In reexamining disparate impact, it should be recognized that it is not necessary to show that there has been intentional disparate treatment directed against any particular member of that class.[13] The disparate impact or consequence is enough.
 
 
 174
 Nor is it necessary to show that the physical requirements were racially motivated or were discriminatorily utilized. The issue to be finally determined is whether the height requirement, which is facially neutral, had a discriminatory impact rather than whether Lee Way adopted or enforced the requirement with a discriminatory purpose in mind. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 & n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).
 
 
 175
 In a Title VII case based on disparate impact, the consequences of the employment practice are prohibited, and good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability. Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
 
 
 176
 On remand, the district court should also consider the Supreme Court's decision in Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), with respect to burden of proof, and this court's decision in EEOC v. Navajo Refining Co., 593 F.2d 988, 990 (10th Cir. 1979). In Navajo Refining Co., this court concluded that in this kind of a case, there must be established discrimination in fact and a disparate impact.
 
 
 177
 In this case the government presented statistics showing that a disparate impact on Spanish surnamed Americans results from a height requirement of 5'7 . Whether the evidence showed discrimination in fact could be determined, for example, by a comparison of the number of Spanish surnamed Americans employed at each terminal with the Spanish surnamed employees living in that city. Of course, a long history of discrimination would also suffice to establish discrimination in fact.
 
 
 178
 Even if discrimination in fact and a disparate impact are established, the only available remedy in this case appears to be injunctive relief to prohibit the further use of a 5'7 requirement. The record does not appear to establish the right of any aggrieved person to receive monetary damages based on a disparate impact claim.
 
 
 179
 THE QUESTION OF NEED FOR AN AFFIRMATIVE HIRING PLAN
 
 
 180
 The district court closed up the case with the entry of judgment. One can understand why inasmuch as the case had been active for many years and had demanded a great deal of time and effort from those involved in its determination and disposition. We question, however, whether, considering the aggravated discrimination which was found in this case, it could be assumed that Lee Way would instantly reform, and that the pattern and practice, which was so plainly invalid, would end the very day the government filed the suit.
 
 
 181
 The trial court was persuaded by the following considerations:
 
 
 182
 First, that Lee Way was sold to Pepsi-Cola Company which the court considered such a large institution that it would not be guilty of any discrimination,
 
 
 183
 Second, that it did not want to be a perpetual superintendent over Lee Way, and
 
 
 184
 Third, that the pattern and practice of discrimination had not continued into the period after the filing of the suit. The court did, however, reserve the right to reopen the case if future circumstances justified such action.
 
 
 185
 The court's reasons are not compelling because when a practice such as that which we find in this case had actually become a way of life for the company, there is little basis for assuming that the company is going to get religion, so to speak, overnight. Indeed, there is some evidence in the record that there was racial discrimination after the suit was filed. The judge felt that these instances were isolated. The judge did hold, as we have noted before, that one of the employees was the victim of retaliation resulting from her having testified.
 
 
 186
 Also, after the government's suit was filed Lee Way started a practice which was at least highly suspicious. It engaged an employment agency to screen all black applicants. White applicants were not required to be screened or interviewed by any outside agency.
 
 
 187
 There is a lack of evidence that the company made progress in adding to its black employees. It is interesting to note that the Master recommended that Lee Way be ordered to undertake affirmative action. The Master also recommended that Lee Way be ordered to maintain records and prepare reports. These recommendations were rejected by the court. The effect of affirmative action is to eliminate all vestiges of the past discrimination. The Master's view was that although some steps were taken to bring about a more equitable hiring and promotion system, this had not eliminated the old system root and branch.
 
 
 188
 The Supreme Court in the case of Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), recognized that district courts have a broad discretion under Title VII to fashion relief in accordance with the necessities of the situation presented. Id. at 418, 95 S.Ct. 2362. The Supreme Court said that
 
 
 189
 where racial discrimination is concerned, "the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."Id., citing Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).
 
 
 190
 The statute in question, 42 U.S.C. § 2000e-5(g) (1976), authorizes the court to "order such affirmative action as may be appropriate." The cases have construed this to include the ordering of affirmative hiring relief.[14]
 
 
 191
 In the leading case of International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court gave some indication as to the appropriate type of affirmative relief that could be granted.
 
 
 192
 Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure the full enjoyment of the rights" protected by Title VII.
 
 
 193
 Id. at 361, 97 S.Ct. at 1874.
 
 
 194
 The factors that are considered in determining whether affirmative relief is to be given are:
 
 
 195
 (1) a long history of racial discrimination by the employer or the union,[15]
 
 
 196
 (2) a comparatively short history of attempts to end racial discrimination by increasing minority hiring and promotion,[16]
 
 
 197
 (3) no significant change in the employer's policies until the government filed suit,[17]
 
 
 198
 (4) the employer's recalcitrance in voluntarily taking action to correct the imbalances created by past discrimination,[18] and
 
 
 199
 (5) lack of significant improvement in the employer's practices.[19]
 
 
 200
 In speaking of Lee Way's history the trial court said that this "was the strongest most sorry case of discrimination I have ever heard of." It is significant that Lee Way did not improve its hiring practices even after the filing of the first suit, Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). Blacks continued to be concentrated in the low paying, less desirable jobs at Lee Way.
 
 
 201
 Lee Way's history then argues for affirmative action. Unless it is shown that the company's hiring of blacks in not only the menial positions but also in all jobs has improved, there should be a plan adopted calling for affirmative action. This is a practical measure which would prevent possible repetition of the long and arduous lawsuit with which we are now involved and which continues.
 
 THE POST-COMPLAINT CLAIMS
 
 202
 There were approximately ten instances of post-complaint discrimination which followed the same pattern as the ones that were involved in the trial before Judge Eubanks. The Master heard evidence with respect to these. The trial court rejected them, however, as not having been a part of the pattern and practice shown in the case tried. This was, for the most part, based upon their difference in time and their coming to the surface late. There is no reason given as to why the pattern and practice changed and why a new era was started.
 
 
 203
 Our view is that it is unjust and inequitable not to consider these cases because if the court does not do so the claims may be lost. The court would have to deal with the problem of the statute of limitations, and this is always a convenient out. It is more equitable to take the claims up because these individuals, who had a right to believe that their cases were going to be disposed of with the rest, should not have to struggle now with the machinery of administrative remedies and court remedies both, a fight which they will, perhaps, ultimately lose. So, since there is no real break in the continuity, there is no apparent reason for not disposing of these cases and doing it expeditiously. These claims are similar to the practices involved in the main suit.
 
 
 204
 THE ISSUE OF RECOVERY OF LOST HEALTH, WELFARE AND PENSION BENEFITS
 
 
 205
 A normal part of the back pay award should have been the inclusion of the company's health, welfare and pension benefits. The district court refused to allow discovery regarding these benefits and held that the government's request for discovery was late.
 
 
 206
 It was on April 16, 1974, that the government sought discovery of Lee Way's pay records. However, when the time came to keypunch the data, the government concluded that the effort would not be worthwhile because the benefits were uniform in amount and did not depend on an employee's base pay. An effort was made to get a stipulation on benefits, but Lee Way refused to stipulate.
 
 
 207
 A formal motion was filed in November 1974, to compel production. On December 12, 1974, the Master denied discovery on the basis that the fringe benefit records had not been included in the original request. A new request was filed under Rule 34 of the Federal Rules of Civil Procedure for discovery concerning the fringe benefits. The Master denied the discovery because the request was not timely made and was too burdensome. The district court upheld the Master expressing concern about the complexities. This ruling prevented consideration of the fringe benefits. If the government was willing to proceed on the benefit question, it would seem that the Master and the district court should have been willing; after all the complexity this case had, a little more was not going to add too much.
 
 
 208
 We, of course, hesitate to add to the burdens of the district court, particularly after it has performed in such a highly praiseworthy way. However, we feel that the benefits are something that should be stipulated and should not prove to be complex at all. In our view, the matter should be remanded for further proceedings.
 
 
 209
 WHETHER THE GOVERNMENT CAN SEEK RELIEF FOR DISCRIMINATION
 
 PURSUANT TO EXECUTIVE ORDER 11246
 
 210
 The Executive Order 11246[20] mentioned above expresses the policy of the government to provide equal employment opportunity in federal employment and prevents discrimination in employment because of race, color or national origin.
 
 
 211
 The order also requires government contractors and sub-contractors to employ workers in a non-discriminatory manner. Certain sanctions are set forth in the order, but a right of the individual employee to collect back wages is not recognized. The remedies are all public in character.
 
 
 212
 The district court, in its order on remand after having considered the Teamsters decision, directed the Master to investigate the question. He did so and concluded that there was no right of action in the government on behalf of the individual employee.
 
 
 213
 We note that the issue is a narrow one: whether there is an implied right in the government allowing it to claim money reimbursement for the benefit of the individual employee.
 
 
 214
 The question is whether the language of the order, providing authorization for "appropriate proceedings brought to enforce these provisions, including the enjoining * * *," Executive Order 11246, § 209(a)(2), authorizes the use of an equitable remedy to require back pay in addition to the obtaining of injunctive relief. On this subject there is virtually no law from the circuits. The Fifth Circuit has, however, dealt with the outer fringes of the problem in United States v. New Orleans Public Service, Inc., 553 F.2d 249 (5th Cir.), vacated and remanded on other grounds, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), ruling that the order cannot override a bona fide seniority system. See also United States v. East Texas Motor Freight System, 564 F.2d 179 (5th Cir. 1977). Lee Way offers this latter decision in support of its contention that the government cannot obtain back pay relief under the order. That reliance is ill-founded; there are other authorities which provide support for the government's position.
 
 
 215
 One federal district court has ruled that relief such as we are here considering is available. We refer to United States v. Duquesne Light Co., 423 F.Supp. 507 (W.D.Pa.1976). The court reasoned that absent a congressional limitation the government is at liberty to seek any remedy which would effectuate the Executive Order. It concluded that it had the equitable power to grant and the government had authority to seek restitutional relief under the Executive Order. It depended for its conclusion on Mitchell v. DeMario Jewelry, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1959), and Porter v. Warner Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1945).
 
 
 216
 Porter was a case involving the Emergency Price Control Act. There the statute authorized the district court to grant "a permanent or temporary injunction, restraining order or other order." 328 U.S. at 399, 66 S.Ct. at 1089. The Court held that an "other order" could include an order for restitutionary recovery sought by the government on behalf of private individuals, stating that "It may be considered as an equitable adjunct to an injunction decree * * * (or) as an order appropriate and necessary to enforce compliance with the Act." 328 U.S. at 399-400, 66 S.Ct. at 1089-1090. This was under traditional equity powers.
 
 
 217
 Of a similar nature was Mitchell v. DeMario, supra, which arose under the Fair Labor Standards Act in the face of a statutory provision, § 17, that prohibited the exercise of such jurisdiction. The Court's conclusion, through Mr. Justice Harlan, was that § 17 of the Act, 29 U.S.C. § 217, had a very limited application. The Court construed § 217 as not applying to reimbursement of lost wages incident to a wrongful discharge. It gave effect to the general equitable purposes of the statute and concluded that in an action such as was presented there the prohibition of § 17 against monetary awards did not apply. The Court further said:
 
 
 218
 We hold that, in an action by the Secretary to restrain violations of § 15(a) (3), a District Court has jurisdiction to order an employer to reimburse employees, unlawfully discharged or otherwise discriminated against, for wages lost because of that discharge or discrimination. The Court of Appeals did not reach the question whether the District Court abused its discretion in declining to order reimbursement. While, because of what we have found to be the statutory purposes there is doubtless little room for the exercise of discretion not to order reimbursement, since we do not have the entire record before us we shall remand the case to the Court of Appeals for consideration of that issue.
 
 
 219
 361 U.S. at 296, 80 S.Ct. at 337.
 
 
 220
 The trial court has not considered these authorities and, therefore, it is not appropriate for this court to superimpose a viewpoint. We believe that the order appealed from here should be vacated and that this issue must be remanded to the trial court for reconsideration in the light of the Supreme Court's authorities cited above.
 
 
 221
 THE APPLICATION OF THE NO-TRANSFER RULE AGAINST PERSONS WHO
 
 
 222
 APPLIED FOR TRANSFERS AFTER THE ENACTMENT OF TITLE VII
 
 
 223
 The individuals who would benefit here had not been illegally discriminated against in their original hiring.[21] It is nevertheless contended that this operation of the rule violated the provisions of Title VII under the Jones v. Lee Way and Griggs decisions. The government's reasoning is that since the rule was held invalid in Jones and Griggs as locking blacks into less desirable jobs, it thereby had a disparate impact on minorities inasmuch as there was no justification as a matter of business necessity and was thus per se unlawful even though it was not, in and of itself, an effort to perpetuate past discriminations.
 
 
 224
 The government depends on Gregory v. Litton Systems, Inc., 472 F.2d 631 (9th Cir. 1972), where the court ruled that under Griggs, neutral practices which perpetuate prior discrimination are unlawful under Title VII. It further held that the Act was enacted for remedial rather than punitive purposes. The court there said that historical discrimination was not essential. 472 F.2d at 632. Also relied on by the government is Wallace v. Debron Corp., 494 F.2d 674 (8th Cir. 1974), where a facially neutral policy was found to have a present disproportionate impact on blacks. Involved was a company rule providing for disciplinary action, including termination, whenever an employee's wages were garnished or where he permitted garnishment proceedings to be brought against the company for more than one indebtedness in any one year period. Id. at 674 n.1. This was very similar to Litton. In that case the company refused to hire anyone who had been arrested "on a number of occasions."[22] Debron held that Title VII requires employees to "remove all artificial, arbitrary, and unnecessary racial barriers to employment . . . ." 494 F.2d at 676.
 
 
 225
 The weakness of the government's position is that there is a lack of evidence to establish the existence of a disparate impact on minority employees. The government does little more than assert that the no-transfer rule has a disparate impact on minorities. As many blacks were discriminatorily placed in low level jobs, there is a preponderance of blacks in those positions who were precluded from transferring out.
 
 
 226
 The case of United States v. City of Chicago, 573 F.2d 416 (7th Cir. 1978), ruled that where assignment and transfer policies were not based on discriminatory intent, the "absence of blacks from certain specialized units was attributable to failure of qualified blacks to apply and to factors other than race . . .", 573 F.2d at 428 (footnote omitted), and that the district court's findings that the defendants had not violated Title VII were not clearly erroneous. This reason is applicable here. Although it is clearly shown that the rule illegally perpetuates past discriminatory hiring practices of a company, there is no showing that the rule has a disparate impact on those who chose to work in the city and shop departments. As to these, there has been no showing that the rule has any greater burden on blacks than it does on whites.
 
 
 227
 The government makes no real showing as to the number of blacks not discriminatorily employed and makes no attempt to contrast that number with the number of whites in similar city and shop positions who are also affected by the rule, and yet as we view it a comparison of this nature, or something that shows a disproportionate impact upon the individuals not covered by the earlier Jones decision is essential. The court cannot, without proof, assume that the no-transfer rule had a disproportionate impact if those blacks who were hired in a discriminatory fashion and against whom the no-transfer rule has been held invalid are removed from consideration.[23]
 
 
 228
 THE TRIAL COURT'S REFUSAL TO CONSIDER THE QUESTION WHETHER
 
 THE OKLAHOMA CITY SHOP COLLECTIVE BARGAINING
 AGREEMENTS HAD BEEN NEGOTIATED WITH
 INTENT TO DISCRIMINATE
 
 229
 The reason that the court refused to consider this question was because it had not been raised by the government prior to the Supreme Court's decision in Teamsters.
 
 
 230
 Lee Way argues that the government's position throughout the trial was that the seniority system had illegally perpetuated the effects of past discrimination. This approach was nullified as a result of the Teamsters decision, and Lee Way contends that the trial court was correct in foreclosing the introduction of a new issue at the end of the proceedings.
 
 
 231
 Lee Way further argues that the bona fides of the seniority system were never raised by the government, no amendment under rule 15(b) was sought, the issue was not raised at the pretrial conference, there are no proposed findings, and the court made no findings. Lee Way's argument does not take into account the fact that the issue did not develop until after the Teamsters decision and the other decisions by the Supreme Court. Lee Way also points out that no evidence has been brought forward that the seniority system was adopted with discriminatory intent.
 
 
 232
 There is some importance to the fact that the issue did not come together in its present form until the Teamsters and Evans decisions on May 31, 1977, which held that a seniority system which perpetuated prior discrimination was valid. It was only then that it became necessary to show that the system was not bona fide; that it was designed with discriminatory intent and in that way violated Title VII. Since this issue developed at such a late date there is some basis for the government's position that it should have an opportunity to develop its case.
 
 
 233
 We recall that following the handing down of the Teamsters and Evans decisions, there was a remand to the Master to consider whether the claimants, whom he found were victims of pre-Act discrimination, should have different relief in the light of the opinions issued by the Supreme Court on May 31, 1977. The Master determined that there was no jurisdiction to consider the government's allegations regarding the Union's contracts; his ground was that the issue as to whether § 703(h) did not protect the contracts since there was a design to discriminate had not been submitted to him.
 
 
 234
 When the above issue returned to the control of the court the judge was unwilling to reopen the matter.
 
 
 235
 Similar issues have been before this and other circuits. In the case of Chicano Police Officer's Ass'n v. Stover, 552 F.2d 918 (10th Cir. 1977), there had been a remand to the circuit for determination as to the existence of discriminatory intent in the light of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Subsequently, it was remanded to the trial court, 552 F.2d at 921, so that the court could make new findings under the intent standard of Washington v. Davis, supra.
 
 
 236
 Other circuits have had the same problem. See Acha v. Beame, 570 F.2d 57 (2d Cir. 1978), and Myers v. Gilman Paper Corp., 556 F.2d 758 (5th Cir.), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). The Fifth Circuit felt that the Teamsters case had removed the underpinnings of Myers and so it vacated the judgment against the union. It remanded to the district court to determine whether appellees could proceed on other theories. 556 F.2d at 760-61. See also United States v. East Texas Motor Freight System, 564 F.2d 179 (5th Cir. 1977), and James v. Stockham Valves & Fittings Co., 559 F.2d 310 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).
 
 
 237
 In Younger v. Glamorgan Pipe and Foundry Company, 561 F.2d 563 (4th Cir. 1977), it was found that because of the employer's seniority and job-bidding practices blacks were frozen into the departments in which they predominated until the inception of open bidding and that the result was discrimination against blacks because of their race. The court held that the Supreme Court's decisions in Teamsters and Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), required the case to be remanded because the seniority system perpetuated pre-Act discrimination. Reconsideration of this was ordered in the light of Teamsters, and the post-Act discrimination was to be reconsidered in the light of Franks.
 
 
 238
 The issue of the bona fides of the seniority system in this case was not tried. This failure was not the fault of the government because the issue did not surface until the Teamsters and Evans decisions were handed down. In view of this there should be some reasonable opportunity extended to the government to develop and present its case in the light of Teamsters particularly.
 
 
 239
 Inasmuch as the cause is being remanded for reconsideration of some issues, and considering the fact that the Teamsters decision introduced a new issue, we conclude that it is desirable that the court have an opportunity to reexamine this issue in order to come to grips with the question whether the collective bargaining agreements had been negotiated with intent to discriminate.
 
 
 240
 THE QUESTION AS TO PROPRIETY OF THE TRIAL COURT'S ORDER
 
 
 241
 ENDING BACK PAY RELIEF AS OF THE DATE OF THE FINAL
 
 JUDGMENT, SEPTEMBER 12, 1977
 
 242
 As discussed above, Lee Way would have had the court terminate or limit back pay as of 1974 when injunctive relief was granted. The court, however, picked out September 12, 1977, as the closing date.
 
 
 243
 It has been mentioned before that the entire back pay concept constitutes equitable relief designed to restore and make whole the victims of discrimination. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 419-22, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Pearson v. Western Electric Co., 542 F.2d 1150 (10th Cir. 1976). District courts have broad discretion in fashioning this relief.
 
 
 244
 The government now maintains that back pay relief was cut off too early even in 1977. The cases are legion that relief should seek to make the victim whole in a circumstance such as this. Frequently this extends back pay relief until such time as the victim obtains his or her rightful place, a place where he or she would have been had it not been for the discrimination.
 
 
 245
 The question is whether the conduct of the trial court was such as to constitute a clear abuse of discretion. The trial judge would appear to have been in good faith in drawing the line as of September 1977. He felt that if there was not a cutoff date that the employees might not get their money during their lifetime. He felt that somehow, if he had an early cutoff date, that they would get some money in their pockets.
 
 
 246
 The court relied on Patterson v. American Tobacco Co., supra, and E.E.O.C. v. Enterprise Ass'n Steamfitters, supra. However, what was meant in those cases was that it was important to fully remedy the discrimination condition.
 
 
 247
 From a consideration of these decisions we determine in favor of a remand to the trial court on this issue, with instructions that the court consider the desirability of extending the period subject to reimbursement until the company actually restores the parties to their rightful places.
 
 THE ISSUES RAISED BY THE TEAMSTERS
 
 248
 THE AWARD BY THE DISTRICT COURT OF VACANCIES THAT WERE
 
 ALLEGEDLY FILLED BY MINORITIES
 
 249
 The Teamsters Union has argued that the district court was in error in awarding vacancies to three black claimants, Howard L. Mitchell, Tommy Lee Adams and George Ware. The Teamsters' argument is that there were minority employees who had been previously awarded these vacancies and that it was invalid to give them to the three black persons. The Union's point is that there was no discrimination if the positions were held by minorities.
 
 
 250
 The argument is that hiring minorities, even though the named candidates enjoyed a slight seniority advantage, is not unlawful since the three named claimants were not denied vacancies based upon their race. We are not going to be led into a racial dispute which pits one person of racial origin against a person of a different race. The only question is whether a particular claimant was afforded a genuine equal opportunity for employment. The employer is not excused from discriminating simply because he hired a member of one or more minorities. Nor does the employer escape because one minority was hired or preferred over another. A practice can nonetheless be discriminatory. Thus, the race or national origin of the person hired does not end the inquiry, as a matter of law, as to whether a claimant was the victim of employment discrimination.
 
 
 251
 Lee Way deprived all of these three black claimants of an equal opportunity of employment. There were job vacancies and they were properly awarded to the claimants, so the argument of the Teamsters is lacking in merit.
 
 
 252
 THE VALIDITY OF THE TRIAL COURT'S ORDER MODIFYING THE
 
 LAYOFF-RECALL PROVISION OF THE COLLECTIVE
 BARGAINING AGREEMENT
 
 253
 The argument here grows out of a finding promulgated by the Special Master and adopted by the trial judge. The Master said:
 
 
 254
 15. It seems equitable to me to permit the full exercise of existing recall rights through September of 1978. After September 30, 1978(,) all claimants who had not yet occupied a future vacancy would be entitled to use the seniority date ordered by the District Court to compete with laid-off employees who had been on lay-off more than 30 days for all recalls and other vacancies in the relevant positions.
 
 
 255
 16. I select this approach as a fair balance between the competing interests. If Lee Way's employment expands over the next 13 months the definition will prove moot. But the legitimate equitable rights of victims of racial discrimination cannot be asked to wait many years for their "rightful place" in order to accomodate (sic) entirely the innocent beneficiaries of Lee Way's illegal conduct. But the aspirations of the Unions and their members as stated in bona fide collective bargaining agreements cannot be ignored. The Teamsters have successfully sought the 3 year recall rights to smooth out the cyclical nature of employment and to provide some degree of security for its members. But the recognition of the full three years might so postpone a claimant's opportunities as to render the award of seniority valueless.
 
 
 256
 17. The virtue of this approach, if the balancing of evils can be called a virtue, is that it strikes a balance in apportioning future expectations among innocent and competing parties, the laid-off employee is protected up to 12 months but the discriminatee is permitted to exercise his relief in at least 12 months.
 
 
 257
 18. To further accomodate (sic) the laid-off employee who is unable to utilize his full three years of recall rights, I find his recall rights should extend for three years from the date of his lay-off not including periods of time he had to wait because discriminatees took his position by virtue of this definition of future vacancy.
 
 
 258
 The Master modified the provision of the collective bargaining agreement having to do with recall rights. He said that he would permit the full exercise of recall rights through September 1978, but as of September 30, 1978, all claimants who had not yet occupied a future vacancy would be entitled to use the seniority date ordered by the district court to compete with laid-off employees, who had been on lay-off more than 30 days, for all recalls and other vacancies in a relevant position.
 
 
 259
 The Master said that the recognition of the full three years might so postpone a claimant's opportunities as to render the award of seniority valueless. It was said that the modification struck a balance in apportioning future expectations among innocent and competing parties: The laid-off employee was protected up to 12 months, but the discriminatee was required to wait for a maximum of 12 months.
 
 
 260
 In opposing the district court's decision, the Union cites Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), where the Court looked at the same recall provision in the National Master Freight Agreement, which is here in issue. However, the Supreme Court did not decide the question with which we are faced. The Court did say that to allow identifiable victims of unlawful discrimination to participate in a layoff recall is not the kind of preference prohibited by § 703(j), 42 U.S.C. § 2000e-2(j).
 
 
 261
 The Supreme Court said that the principles of equity should govern the extent to which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place. This means that the decree must draw on "the 'qualities of mercy and practicality (that) have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' " 431 U.S. at 375, 97 S.Ct. at 1874.
 
 
 262
 The Supreme Court went on to say that the balancing is to be made in the trial court's equitable discretion. Unquestionably the reasons articulated by the Master and by the district court satisfied the requirements of the Supreme Court in Teamsters. Also, our view is that the Union's approach is not based upon equity and would not produce a more equitable result. For one reason, for the past two years the layoff-recall position has been operating as it did originally, and the discriminatees are still waiting for their awards. The Union wants to perpetuate this delay, whereby the three-year provision would be given full effect. Considering that there will possibly be future appeals and that there will be future proceedings in the district court, it could be another long period of time before the three-year period is used for the last time. We are saying that there is a threat of further substantial delay to the victims of discrimination being given full opportunity to fill vacancies. All of this is inequitable and contrary to the letter and spirit of Title VII.
 
 
 263
 The judgment of the district court is, for the most part, affirmed. The trial court is to be commended for the long and persistent effort which was given to this struggle.
 
 
 264
 There are a few remaining issues that need further attention. These were the subject of a cross-appeal by the United States and the E.E.O.C.
 
 
 265
 For example, there is the question of the height requirement used by Lee Way which, it is contended, has a disparate impact on Spanish surnamed Americans.
 
 
 266
 Secondly, there is the issue of a need for an affirmative action plan which would involve continued jurisdiction at least for a period of time.
 
 
 267
 Third, there is the matter of the post-complaint claims.
 
 
 268
 Fourth, we have ruled that the issue of recovery of lost health, welfare and pension benefits should be taken up on remand.
 
 
 269
 Fifth, we have also directed the trial court to consider possible remedies under Executive Order 11246.
 
 
 270
 Sixth, there is the matter of the application of the no-transfer rule to persons who applied for transfers after the enactment of Title VII. This requires some further analysis of evidence.
 
 
 271
 Seventh, we have also considered and remanded the question as to propriety of the trial court's order terminating back pay relief as of the date of the final judgment.
 
 
 272
 These questions, none of which go to the central merits of the case but which are of great importance to the persons aggrieved, are remanded for the further proceedings indicated.
 
 
 273
 APPENDIX I.
 
 
 274
 Employment statistics in the record both before the trial court and the Master reflect the following:
 
 A. Oklahoma City Terminal
 
 275
 (1) Over the road drivers
 
 
 276
 a. The first black road drivers were hired by Lee Way in August of 1968 and no additional black road drivers were hired at the Oklahoma City Terminal between August, 1968 and December 31, 1968.
 
 
 277
 b. From January 1, 1969 through June, 1972, Lee Way hired a total of 743 regular road drivers at the Oklahoma City Terminal of whom only 14 (1.8%) were black. As of June 30, 1972 Lee Way employed a total of 794 road drivers at the Oklahoma City Terminal of whom 12 (1.5%) were black.
 
 
 278
 c. On January 17, 1973, Lee Way employed a total of 848 road drivers at the Oklahoma City Terminal of whom 17 (2.0%) were black. During 1973, Lee Way hired a total of 292 road drivers at the Oklahoma City Terminal of whom 23 (7.8%) were black.
 
 
 279
 d. There is no information in the record reflecting by race the number of road driver new hires at the Oklahoma City Terminal for the years 1974, 1975, and 1976. The record does, however, reflect that Lee Way has made an effort to affirmatively attract minority road drivers, although statistical evidence indicating their success is not in evidence.
 
 
 280
 e. Since at least 1969, Lee Way has recruited applicants for road driving jobs in Oklahoma City from a multi-state geographical area including Oklahoma, Missouri, Kansas, Texas, and Louisiana. Subsequent to the filing of the instant action, Lee Way retained the services of a black recruiter and sent him on recruiting trips for black road drivers into several states including Oklahoma.
 
 
 281
 (2) Clerical Employees Oklahoma City General Office and Oklahoma City Terminal Office
 
 
 282
 a. From approximately May, 1967, through August, 1974, Lee Way hired at least 85 non-blacks in clerical positions at the Oklahoma City General Office. The first black clerical employed by Lee Way was Juanita Collins who was hired on August 10, 1968. Prior to June, 1972, Collins was the only black clerical ever employed by Lee Way in Oklahoma City. As of January 25, 1972, Lee Way employed a total of 122 persons at the Oklahoma City General Office of whom only one (.008%) was black.
 
 
 283
 b. From 1967 through May, 1974, Lee Way hired at least 30 non-black clerical employees in Oklahoma City at the Terminal Office. The first black ever employed at Terminal Office was Sadie Pittman who was hired by Lee Way on November 23, 1971. Prior to June, 1972, Pittman was the only black clerical ever employed by Lee Way at the Oklahoma City Terminal Office. As of July, 1972, Lee Way employed a total of 24 clerical employees at the Oklahoma City Terminal Office, none of whom were black.
 
 
 284
 c. Since June of 1972, Lee Way has apparently employed a total of four black clerical employees at the Oklahoma City General Office but has not apparently employed any black clericals at the Oklahoma City Terminal Office since that period.
 
 
 285
 (3) Management and Supervisory
 
 
 286
 a. As of June, 1972, Lee Way employed a total of 380 management and supervisory employees throughout its system of terminals of whom seven (1.8%) were black. Lee Way's first black supervisor was employed in May, 1971 and its first black management trainee in February, 1972. As of July 22, 1972, Lee Way employed approximately 117 management and supervisory employees at the Oklahoma City Terminal of whom four (3.4%), were black. Three of these blacks were dock foremen and the other was a shop supervisor.
 
 
 287
 b. Under Lee Way's management training program in Oklahoma City, instituted in 1969, Lee Way had hired 29 management trainees of whom only one was black prior to June, 1972. Between August, 1972 and February, 1973 Lee Way hired seven blacks as management trainees in the Oklahoma City Terminal.
 
 
 288
 (4) Shop Job Classifications
 
 
 289
 a. Prior to September, 1968 Lee Way employed blacks only in positions as janitors, porters, and greasemen (servicemen) at the Oklahoma City Shop. In September, 1968 Billy Joe Lewis was allowed to transfer to the job of tireman after a decision of the Oklahoma Human Rights Commission had been issued finding discrimination against blacks throughout Lee Way's job classifications. In October, 1968 Lee Way hired its first black journeyman mechanic and in March, 1971 Lee Way employed its first black apprentice mechanic.
 
 
 290
 b. From January 1, 1969 through December of 1971, Lee Way directly hired 22 mechanics and apprentice mechanics at the Oklahoma City Terminal Shop, all of whom were white. Lee Way's first black journeyman tractor mechanic at the Oklahoma City Shop was hired on March 28, 1972 and terminated on May 27 of the same year.
 
 
 291
 c. From June, 1965 through December, 1973, Lee Way hired at least 43 journeyman tractor mechanics of whom 2 were black. Eighteen of these mechanics, including the two blacks were hired between May, 1972 and December, 1973. (It is to be noted that the number of specific job vacancies in the shop is difficult to be precisely determined because the computer records do not reflect the department and classification of a number of the shop employees hired in Oklahoma City in previous years who have since left Lee Way's employment.)
 
 
 292
 d. As of August 7, 1972 Lee Way employed a total of 38 journeyman tractor mechanics at the Oklahoma City Terminal, none of whom were black. The first black apprentice employed in the tractor department was hired by Lee Way on July 10, 1972. From 1965 to 1971, Lee Way hired 11 apprentices who were assigned to the tractor department, none of whom were black.
 
 
 293
 e. From 1968 through 1973 Lee Way hired at least seven journeyman trailer mechanics of whom one was black.
 
 
 294
 f. The first black apprentice mechanic assigned to the trailer department was hired by Lee Way on May 16, 1972. Between 1968 and 1971, Lee Way hired at least three apprentices who were assigned to the trailer department, none of whom were black.
 
 
 295
 APPENDIX II.
 
 
 296
 There follows six examples of individual discrimination found by the district court in its findings of fact. There is no indication that these findings were clearly erroneous.
 
 1) Finding # 113:
 
 297
 Tom Combs, black, sought to apply at Lee Way for a road driver position in April 1969. At the time Mr. Combs had approximately fourteen years of tractor-trailer experience (the type of "rig" or truck driven by line drivers), most of which involved over-the-road driving. Mr. Combs was informed by a company official that Lee Way was not hiring road drivers or taking applications, and he was not considered for employment. In April of 1969 Lee Way hired forty over-the-road drivers, all of whom were white.
 
 2) Finding # 115:
 
 298
 Billy Medlock, black, sought to apply for a road driver position at the Oklahoma City Terminal in May of 1971, after reading a newspaper advertisement that Lee Way needed drivers (Lee Way argues, on appeal, that the fact that they advertised widely for employees should negate any finding of discriminatory purpose or action). Mr. Medlock, after giving his name to a receptionist, waited in the reception room at the terminal for approximately an hour and a half in order to obtain an interview with the line driver supervisor. During this time three whites were interviewed by the driver supervisor. At around 2:00 p. m. the driver supervisor, upon receiving Mr. Medlock's name from the receptionist, looked at Mr. Medlock and announced that he was not going to interview any more drivers. Mr. Medlock left and was hired a week later by another carrier as a road driver. In May of 1971 Lee Way hired thirty-six road drivers, all of whom were white. At the time Mr. Medlock sought to apply for employment he had approximately seventeen years of tractor-trailer experience. Lee Way has stipulated that Mr. Medlock was qualified for employment at the company.
 
 3) Finding # 125:
 
 299
 Clifford Downey, black, sought to apply for an over-the-road position at Lee Way in April of 1972. He was informed by a Lee Way official that the company was not hiring road drivers and he was not allowed to fill out a written application. At this time Mr. Downey had approximately four years of tractor-trailer experience as an over-the-road driver. In April of 1972 Lee Way hired thirty-five road drivers, none of whom were black.
 
 4) Finding # 126:
 
 300
 Johnny McNeeley, black, sought to apply for a road driver position in April or May of 1972 after seeing an advertisement in the newspaper that Lee Way was hiring road drivers. When he arrived at the terminal Mr. McNeeley was informed by a Lee Way official that Lee Way was not hiring any truck drivers and not taking applications. At this time Mr. McNeeley had approximately ten years of tractor-trailer experience and he had never had an accident in a truck.
 
 5) Finding # 129(d):
 
 301
 Rudolph Jones, black, applied for a road driver position at Lee Way in 1970 after being referred to the company by the Urban League. At that time Mr. Jones had approximately six years of tractor-trailer experience, much of which involved over-the-road driving. After filling out a written application Mr. Jones was informed by the driver supervisor that while he had a sufficient amount of experience driving tractor-trailers, he was disqualified because he did not have experience hauling "heavy loads." Lee Way has never maintained such an experience requirement.
 
 
 302
 6) Finding # 153 (All driver applicants must undergo a road test to be sure that they can operate the equipment. There was no evidence that Lee Way has ever utilized a black road driver supervisor . . . . The supervisors administer the tests and the determination of whether to record an applicant's deficiencies on the test and whether to pass an applicant lies within the sole discretion of the supervisor.);
 
 
 303
 In 1970 a road driver supervisor, behind the back of a black road test applicant, turned off a valve which resulted in locking the brakes on the tractor-trailer unit about to be driven by the black applicant for his test, thereby causing the engine to be killed when the clutch was released. This was done deliberately so as to be able to "flunk" the black.
 
 
 304
 BARRETT, Circuit Judge, concurring in part, dissenting in part:
 
 
 305
 I concur with the majority's holding that the back pay damage awards ordered by the District Court relating to some 52 individual minority claimants totalling $1,800,000.00 for unlawful, discriminatory employment practices undertaken by Lee Way after the effective date of Title VII (July 2, 1965) are supported by this record.
 
 
 306
 I do not agree with the majority's repeated assertions that Lee Way has maliciously and vexatiously discriminated against minorities and that it continues to do so. While the majority opinion apparently finds nothing in the record to indicate that Lee Way has pursued efforts to correct discriminatory employment practices, I suggest otherwise. The trial court found that the pattern and practice of discrimination against blacks ended on the day the Government filed its lawsuit. Furthermore, the actual discrimination found to exist was substantially less than that which was charged, i. e., of the 164 blacks whom the Government claimed had been the victims of discrimination at Lee Way, only 128 elected to file claims for relief with the master, and thereafter, only 52, or less than one-third of the alleged victims of discrimination, were found to be entitled to any relief.
 
 
 307
 I dissent from the majority holding that the drivers entitled to back pay awards must receive one hundred per cent of their back pay without any deductions for meals, lodging and other expenses incurred by those who were actually driving at the time. Under the Act, parties discriminated against are entitled to be made whole they are not, however, entitled to receive a windfall. I am unable to accept the majority's assertion that "any effort by the court to work out an acceptable figure would be impossible". This does not ring true, in my view, when we consider that the majority thereafter held, contrary to the master and district court, that a figure could be stipulated to relative to the recovery of fringe benefits, and that such a figure was "something that should be stipulated and should not prove to be complex at all". I cannot understand why, assuming that a figure could be stipulated to representing fringe benefits, that a similar figure could not likewise be stipulated to representing the expenses to be deducted from back wages due. I would not apply a double standard.
 
 
 308
 I also dissent from the majority's holding that remand of this case is necessary for consideration of (a) the height requirement; (b) the need for an affirmative action plan and continued jurisdiction; (c) post complaint claims; (d) recovery of fringe benefits; (e) possible remedies under Executive Order 11246; (f) application of the no-transfer rule to persons who applied for transfer after the enactment of Title VII; (g) the propriety of the court's order terminating back pay relief as of the date of the final judgment; and (h) the bona fides of the seniority system. The remand mandates involve either matters previously considered and disposed of by the master and trial court or matters not presented as direct issues on appeal. The majority opinion nonetheless mandates their consideration as "questions, none of which go to the central merits of the case but which are of great importance to the parties aggrieved."
 
 
 309
 In cases of protracted litigation such as that involved here, I believe we should confine our appellate concerns to issues "which go to the central merits of the case". I am disinclined in cases of this nature to remand for further consideration of those matters which have already been carefully considered and decided by both a master and trial court. This is particularly so when, as here, clear error is not found in the proceedings below. I am the more disinclined to remand for matters not presented for our direct review on appeal.
 
 
 
 [1]
 This section provides:
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 [2]
 This minimal number of black applicants does not, in our view, speak favorably for Lee Way's efforts to reverse the unfavorable trend
 
 
 [3]
 Lee Way's standards included the following:
 (1) no prior felony convictions, (2) two years of tractor-trailer experience (one year after March 1972), (3) traffic violation limit (a maximum of three violations during three years prior to application), (4) height of between 5'7 and 6'2 , (5) weight not to exceed 225 pounds, (6) no relatives employed by the company, and (7) satisfactory completion of a road test.
 
 
 [4]
 In 1972, 48 whites (from 1088 white applicants) were hired even though they failed to satisfy all the minimum employment requirements. Only four minorities were hired as road drivers in 1971, and only 30 were hired in 1972. In 1971, only one percent of those hired as road drivers were minorities. By 1972, about nine percent of the road drivers hired were minorities
 
 
 [5]
 This contention is discussed in greater detail below
 
 
 [6]
 The relevant statutory section, 42 U.S.C. § 2000e-5(g), is very broad in setting guidelines. Broad discretion is granted to the judge in structuring a plan. This section provides:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.
 
 
 [7]
 474 F.2d 906, 922 n. 21
 
 
 [8]
 Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir. 1978); Kaplan v. International Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1363 (9th Cir. 1975); Sprogis v. United Air Lines, Inc., 517 F.2d 387, 392 (7th Cir. 1975); Nabors v. NLRB, 323 F.2d 686, 692 (5th Cir. 1963), cert. denied, 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964)
 
 
 [9]
 Jurinko v. Edwin L. Wiegand Co., 331 F.Supp. 1184 (W.D.Pa.1971), modified on other grounds, 477 F.2d 1038 (3d Cir. 1973), vacated, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973) (remanded for consideration in light of McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), unpublished remand to the district court, 497 F.2d 403 (3d Cir. 1974) (per curiam) (remand to the district court), 528 F.2d 1214 (3d Cir. 1975) (third remand to the district court to determine whether the claimants were qualified for the jobs they sought and to determine what effect an offer of employment by the defendant had on damages)
 
 
 [10]
 Brito v. Zia Co., 478 F.2d 1200, 1204 (10th Cir. 1973). Judge Barrett cited Jurinko v. Edwin L. Wiegand Co., 331 F.Supp. 1184 (W.D.Pa.1971) for this proposition
 
 
 [11]
 Dothard v. Rawlinson, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 249 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971)
 
 
 [12]
 Blake v. City of Los Angeles, 595 F.2d 1367, 1379-83 (9th Cir. 1979). The Ninth Circuit reversed the district court's determination (by summary judgment) that the minimum height and physical strength requirements for Los Angeles police officers were dictated by business necessity. Id. at 1374-75. The employment requirements had a severe adverse impact on female applicants. Id. at 1374
 
 
 [13]
 See B. Schlei & P. Grossman, Employment Discrimination Law 1192 (1976)
 
 
 [14]
 United States v. City of Chicago, 549 F.2d 415, 436 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Patterson v. American Tobacco Co., 535 F.2d 257, 273 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); Watkins v. Scott Paper Co., 530 F.2d 1159 (5th Cir.), cert. denied, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); Rios v. Enterprise Ass'n Steamfitters Local 638, 501 F.2d 622, 629 (2d Cir. 1974); United States v. Masonry Contractors Ass'n of Memphis, Inc., 497 F.2d 871, 877 (6th Cir. 1974); United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. United Brotherhood of Carpenters & Joiners, Local 169, 457 F.2d 210 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); United States v. Ironworkers Local 86, 443 F.2d 544, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971)
 
 
 [15]
 United States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Rios v. Enterprise Ass'n Steamfitters Local 638, 501 F.2d 622, 631 (2d Cir. 1974); United States v. International Brotherhood of Electrical Workers, Local 38, 428 F.2d 144, 151 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970)
 
 
 [16]
 United States v. International Brotherhood of Electrical Workers Local 38, 428 F.2d 144, 151 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970)
 
 
 [17]
 Id
 
 
 [18]
 United States v. City of Chicago, 549 F.2d 415, 437 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)
 
 
 [19]
 Morrow v. Crisler, 491 F.2d 1053, 1055 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974)
 
 
 [20]
 30 Fed.Reg. 12319 (Sept. 24, 1965)
 
 
 [21]
 There are nine claimants involved in this issue
 
 
 [22]
 Gregory v. Litton Systems, Inc., 316 F.Supp. 401, 402 (C.D.Cal.1970), aff'd, 472 F.2d 631 (9th Cir. 1972)
 
 
 [23]
 The government points out that over 75 percent of Lee Way's minority employees were employed in the city and shop positions when the suit was filed in 1972, compared to about 35 percent of the white employees. This is contrasted with the fact that over 97 percent of the line drivers were white. Again, a safe assumption is that most of the minorities included in these figures were hired on a discriminatory basis as to them the no-transfer rule is invalid. But these figures do not aid in showing disparate impact on those who were not discriminated against when hired