**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,**

**and**

**Mario Fort, Plaintiff-Intervenor,**

v.

**RISS INTERNATIONAL CORPORATION, Defendant.**

**No. 76–CV–560–W–6.**

United States District Court, W. D. Missouri, W. D.

Nov. 6, 1981.

---

Robert G. Johnson, E.E.O.C., St. Louis, Mo., for plaintiff E.E.O.C.

Arthur A. Benson II, Kansas City, Mo., for plaintiff-intervenor Fort.

Rodger J. Walsh, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

The above-captioned cause is brought by the Equal Employment Opportunity Commission, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, alleging racially discriminatory discharge of the intervenor and a pattern and practice of racially discriminatory hiring. The intervenor, Mario Fort, was hired on the date of his application, October 13, 1972, Plaintiff's Exh. 1, for the position of mail clerk for defendant starting October 16, 1972. Defendant, Riss International Corporation, discharged Fort from that position on November 14, 1972, stating the reason for discharge as falsification of his employment application. On November 27, 1972, Fort filed a complaint of discrimination with the Kansas City Department of Human Relations. Plaintiff's Exh. 2. A charge was made with plaintiff EEOC on July 11, 1973, Plaintiff's Exh. 3, and the EEOC referred the charge to the Missouri Commission on Human Rights on the next day. Plaintiff's Exh. 4. That Commission waived jurisdiction to the EEOC "so that EEOC may proceed with their investigation without further delay," Plaintiff's Exh. 5, on July 19, 1973.

After notice of the charge to defendant, unsuccessful attempts at conciliation and other procedural steps which will be further detailed in this Memorandum, this action was filed on September 7, 1976. Fort's motion to intervene was granted September 27, 1977. Following transfer of this cause to this division and further discovery, issues of liability were tried to the Court March 6 through March 12, 1981. A transcript was requested and prepared and post-trial briefs have been filed and considered. This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

A threshold issue raised by defendant is whether all jurisdictional prerequisites, including timely filing of the EEOC charge by Fort, attempted conciliation within the meaning of the statute and other administrative proceedings, have been met. The Court finds that the EEOC charge was timely filed for either of two reasons. First, the complaint to the city agency was made promptly, and more than sixty days after that complaint but less than 300 days from the discharge the EEOC charge was filed; second, in the alternative, the state commission waived its jurisdiction and referred the charge back to the EEOC prior to the expiration of 300 days.

In *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), the Supreme Court held that, when applying the 300-day limit to the filing of an EEOC charge in a deferral state, the charge was not considered filed with the EEOC until state or local agency proceedings were completed or 60 days had passed. Allowing for that requirement, the EEOC charge then had to be filed within 300 days of the date of the act complained of. However, within the 300 days, the Court held there is no shorter time requirement for any step in

the procedure. "Congress included no express requirement that state proceedings be initiated by any specific date in the portion of the subsection that relates to time limitations in deferral states.... (W)e do not believe that a court should read in a time limitation provision." *Id.* at 816 n. 19, 100 S.Ct. at 2491 n. 19. "(A) complainant in a deferral state having a fair employment practices agency over one year old *need only file his charge within 240 days* of the alleged discriminatory employment practice in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII *will nonetheless be preserved* if the State happens to complete its consideration of the charge prior to the end of the 300-day period." *Id.* at 814 n. 16, 100 S.Ct. at 2491 n. 16 (emphasis added). See also, *Owens v. Ramsey Corp.*, 656 F.2d 340 (8th Cir. 1981); *Boyd v. Madison County Mutual Ins. Co.*, 653 F.2d 1173, 1176 (7th Cir. 1981); *Wiltshire v. Standard Oil Co.*, 652 F.2d 837, 839–40 (9th Cir. 1981).

The state proceedings in the instant cases were instituted 240 days after discharge, when the EEOC forwarded the charge. See *Mohasco, supra,* 447 U.S. at 816, 100 S.Ct. at 2491. As stated above, there is no requirement that it be filed earlier to preserve federal jurisdiction, regardless of State law requirements. As the State Commission waived jurisdiction on July 19, 1973, and the EEOC deemed the charge filed thereafter on July 23, 1973, 251 days after discharge, the timeliness requirement of 300 days in deferral states was met.

In light of *Mohasco*, the Eighth Circuit no longer follows the rule on which defendant relies. *Owens, supra,* at 342.

■ In the alternative, initial filing of a complaint with the Kansas City Department of Human Relations would have sufficed, as, in fairness, it should, since Fort acted promptly to register a complaint with an appropriate agency.

The Department of Human Relations, while not officially designated by EEOC as a "deferral" or "706" agency, has sufficient authority under local ordinances to justify Fort's recourse to it. *St. Aubin v. Transcon Lines, Inc.,* 420 F.Supp. 972 (D.Neb.1976). The Kansas City ordinances follow the pattern described in the cited case, which pertains to the Omaha Human Relations Department.[1]

■ Defendant contends that it did not receive notice of the charge within ten days (asserting it was first received December 3, 1973), and that this delay bars this suit. Even assuming a failure to give ten-day notice, such failure would not be fatal to the complaint in itself. *EEOC v. Airguide Corp.,* 539 F.2d 1038 (5th Cir. 1976). No specific prejudice relating to the particular period of less than five months which is in issue was asserted; moreover, it is Fort who has been victimized by delay in failing to receive a ruling on liability for almost nine years after his discharge. Aside from that issue, there is no showing that EEOC did not attempt to notify defendant (or even that it was not successful in doing so) as early as EEOC records would indicate. The copy of the notice in the Commission file is dated July 24, 1973. Subsequent attempts to obtain a receipt for service of the charge were made but were unsuccessful. Plaintiff's Exhs. 6–7c. The defendant received adequate notice, although it is to be regretted that the municipal agency apparently failed to give early notice or to take any action on the complaint.

1. Ordinance No. 38453, amended 7–2–70, makes it an unlawful practice for an employer with six or more employees to discharge a person because of race or color. §§ 26.221 and 26.222, Revised Ordinances of Kansas City, Missouri. Complaints must be filed with the Department of Human Relations within sixty days of the occurrence complained of; the City's Fair Employment Committee is authorized to issue a cease and desist order; judicial review of the order may be had in Missouri's circuit courts; and municipal court enforcement is available when there is a refusal to comply. §§ 26.224 and 26.225, Revised Ordinances of Kansas City, Missouri. Judicial notice of these ordinances is authorized under *Newcomb v. Brennan,* 558 F.2d 825 (7th Cir. 1977) and *Oceanic California, Inc. v. City of San Jose,* 497 F.Supp. 962, 967, n. 8 (N.D.Cal. 1980).

■ Following notice, the Commission commenced investigation of the charge, which was itself initially challenged by the defendant in a petition to revoke and motion to quash subpoena based on the contention that the statute of limitations (referring to the filing time requirements) had run. Defendant's Exhs. 20, 15. This delayed proceedings somewhat, and even after the Commission denied defendant's petition and motion, Defendant's Exh. 12, there was only limited cooperation in the investigation, e. g., Plaintiff's Exh. 9. A determination of reasonable cause was made October 28, 1975, Plaintiff's Exh. 10. Thereafter, the defendant declined to furnish any further information on the matter to the EEOC (again based on the timeliness issue). Defendant's Exh. 8. The EEOC then notified defendant, on January 8, 1976, that it considered efforts to conciliate unsuccessful and would not attempt further conciliation unless it was requested. Plaintiff's Exh. 11. No request was made and suit was filed eight months later. See also, Tr. at 243–95.

The delay herein is not so "inordinate" nor the prejudice established "with such clarity as to leave no room for controversy" as to warrant the extreme equitable decision to dismiss the entire action. *EEOC v. Westinghouse Electric Corp.*, 592 F.2d 484 (8th Cir. 1979) (allegations of delay similar to instant case; dismissal deemed inappropriate *in toto*, but claims of certain classes of plaintiffs to individual back pay relief may be barred); *EEOC v. Liberty Loan Corp.*, 584 F.2d 853 (8th Cir. 1978) (lengthy delay during which there was complete changeover in management, operations and personnel and no reasons for EEOC delay). The subsequent delay in Court proceedings, while also unfortunate, may not be used to the advantage of the defendant. *EEOC v. Cook Paint*, 26 EPD ¶ 31,935 (W.D.Mo.1981) (remedial order) (citing *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 932 (10th Cir. 1979)). The Supreme Court has noted that administrative delay in EEOC cases was known to Congress when it declined to impose time deadlines on that process. *Occidental Life Ins. Co. v. EEOC,*

432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). The distinction as to notice between an EEOC case and other litigation was also made by the Court in observing that defendants receive notice of the charge which affords them "an opportunity to gather and preserve evidence in anticipation of a court action," *Id.* at 372, 97 S.Ct. at 2457, and subsequently receive notice of the determination of reasonable cause and termination of conciliation. Rather than acting as a bar to any relief, where "inordinate" EEOC delay "significantly handicapped" a defendant, "the trial court may restrict or even deny backpay relief" and has discretion to otherwise "locate 'a just result' in light of the circumstances of the case." *Id.* at 373, 97 S.Ct. at 2458 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424–25, 95 S.Ct. 2362, 2374–75, 45 L.Ed.2d 280 (1975)).

In the instant case, defendant was given the "opportunity to gather and preserve evidence," at least from the first date upon which it was put on notice that the EEOC investigation extended to applications. Prior to that date, there may be a plausible reason for not having preserved application data for longer than six months, as Fort's charge did not in itself initially challenge application practices. There is no allegation that any records regarding Fort himself were destroyed. Neither is there any way to determine if there were any persons similarly situated to Fort whose records were not preserved (other than the ones presented at trial). If there were, those records, and the application records once the company was put on notice that application and hiring were included in the investigation, were required to be retained until final disposition of this cause, pursuant to 29 C.F.R. § 1602.1. Common sense would also lead one to assume that defendant would preserve any evidence favorable to its contentions upon reasonable notice that it may be needed. These aspects, and any prejudice which defendant may be able to prove in further proceedings regarding relief, need not be explored in depth within this Order, as it is found that there is no delay that would bar this action or that

would bar complete individual relief to Mario Fort. The subject is discussed herein primarily to illustrate that no complete defense has been established on this basis, and, hopefully, as guidance for the parties in formulating proposals for relief proceedings pursuant to the finding of liability which the Court now makes.

▉ Conciliation efforts were also adequate under all the circumstances. Such efforts "are important to the extent that good faith conciliation of a charge is a prerequisite to suit, but the terms or details on which the EEOC was willing to conciliate should not be examined by the Court and are not relevant or controlling. . . ." *EEOC v. Cook Paint, supra* (citing *EEOC v. Zia Co.*, 582 F.2d 527, 533 (10th Cir. 1978)). The EEOC did not consider its conciliation efforts unsuccessful in this case until after defendant notified it that no further information to assist in such efforts would be forthcoming; defendant made it fairly clear that it would not be likely to conciliate on any terms, considering the position taken as to timeliness, ruled unfounded in both administrative proceedings and herein. Conciliation was attempted in good faith.

## II.

▉ As the pattern and practice allegations of this action do not relate to discharge, the termination of Mario Fort's employment may be most easily understood and analyzed in the framework of an individual disparate treatment action. An individual "Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)). The prima facie case here includes the following proof which, taken together

as the totality of circumstances surrounding the discharge, and, lacking adequate rebuttal (that attempted having been shown to be pretextual), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 807, 93 S.Ct. at 1826 establishes defendant's liability for the discriminatory discharge:

1. The workforce at the time of Fort's hiring and discharge showed only minimal black employment. While no actual applicant data is available for that time period, there was an approximately 10% black labor force in the Kansas City area, a figure verifiably modest when considering the heavy black walk-in ratio obtained from general newspaper advertisements. No change was asserted in the method of advertisement and there was no testimony that the applicant ratio at that time was much lower or that there was any reason to assume it would have been; all indications were to the contrary. Tr. at 282; Defendant's Exh. 21 (number of black employees and hires compared to total for 1972); Ferguson Depo. at 28.

2. At that point in time, there was marked racial sterotyping of job assignments of the few black employees (maintenance man, elevator operator). Tr. 637–42, 682.

3. The reason given for discharging Fort (purported falsification of application records by not listing two minor city ordinance violations, one of which was as a juvenile) was apparently unprecedented in more than fifteen years company experience. There was no showing that there had ever been a discharge of a white employee for that reason. Recent more serious disclosures as to white employees did not cause them to be discharged. The testimony indicated that company policy had not changed or liberalized as to falsification or criminal records, so as to justify the difference in treatment between Fort and the white employees. Plaintiff's Exhs. 12(b), 13a–c; Tr. at 661–62 and 809–10; Russell Depo. 43–44.

4. While testimony indicated that adverse action based on such falsification shown by later verification of arrest and conviction records had always been done on a "case-by-case" basis with a review of some sort by the supervisor of the circumstances, this was not done in Fort's case as it was in the cases of white employees. There was a failure to invite any explanation on his part or to confer with him regarding the ordinance violations, as might be expected in normal human relations free of arbitrary decision-making. The action taken was so "totally arbitrary" as to be suspect under the *Furnco* doctrine (438 U.S. at 577, 98 S.Ct. at 2949), considering the fact that the categories which defendant asserted would include those violations actually asked for "traffic, misdemeanor, or felony," did not ask for municipal ordinance or juvenile charges, and such reasons which could have exonerated Fort were offered in an attempt to explain why white employees may have been allowed to stay. An ordinary layman or a lawyer would not generally consider the Fort violations to come within the listed categories. Tr. at 43–45, 52–53, 56, 648, 661–79, 1038; Plaintiff's Exh. 1 p. 3.

5. The timing of the discharges coincided with a racially provocative act—Fort's flaunting (as it may have appeared to the all-white management) of his marriage to a white wife. Tr. at 40–43, 58–61.

6. Further racial inference may be drawn from the purported reason for discharge, in that a common prejudicial stereotype of "typical" black dishonesty was apparently drawn and acted upon with hardly a scintilla of evidence. All of these pieces fit together to form a solid conclusion of discrimination. It would appear that employment of blacks by defendant was on something of an experimental basis, and that a nervous management decision was made in this case, holding Fort to a higher standard than was or would be imposed on white employees.

There was no attempt to show that defendant made any efforts to obtain the presence or testimony of Bill Gardner (Fort's firing supervisor), e. g., Tr. at 673, or his secretary, Betty Hughes (who met Fort's wife for the first time just moments before Fort was called to Gardner's office and informed of his termination). There was instead a misplaced effort to present character witnesses for the company president in 1972, Robert Riss, but no effort to directly or indirectly show lack of bias on the part of Gardner or Hughes, the most material actors. Insofar as Riss' attitudes are marginally relevant to the Fort incident, he was depicted as being notably helpful to blacks outside his business, but the record is entirely silent as to his activity in encouraging nondiscriminatory behavior in business-related personnel practices, through the time of Fort's discharge. When Fort went to him at the time of discharge, there was no effort to investigate the situation or Fort's belief that it was related to the appearance of his wife. Some years after the Fort incident, Riss told Robertson on one occasion to go ahead with an affirmative action program (Robertson Depo. at 13, 57, 62), but this was apparently after he knew the company was under investigation, and the follow-through, according to the evidence, can at best be described as fitful. Riss also indicated that he actually knew little of the content or effect of the program.[2]

Defendant has thus failed to rebut the persuasive showing of discrimination against Fort through testimony of his supervisors or others responsible for personnel practices.

### III.

■ The pattern and practice aspects of this suit relate to hiring only. The EEOC seeks to bolster its case by making proof of

---

**2.** Visits to East High School and unnamed black vocational schools may conceivably help explain the rise in black employment which appears during one or two periods in the survey, although there is no real showing of an increase in the black applicant rate. The increases in employment were sporadic and appear to have been intentionally "capped" at the labor market percentage without regard to actual application ratios.

post-complaint and post-litigation conduct. Such proof has little relevance (except as noted above) to the mistreatment of Fort. It is relevant, however, in considering whether company-wide liability exists, on an inquiry triggered by the Fort complaint, to establish liability for purposes of 1) general injunctive relief prohibiting discriminatory hiring, and 2) possible issues of relief to individual discriminatees other than Fort. The EEOC case, as distinguished from the "Fort case," includes both pre-litigation and post-litigation evidence [3] of the following facts:

1. There was statistical proof of black employment at levels below that which would be expected considering the Kansas City standard (at least for the years 1972 and before, 1973, 1974 and 1975). Plaintiff's Exh. 25(a)–(e). See generally, *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

2. The racial stereotyping in job placement.

3. The Fort incident, viewed here as one minor indication of racial bias.

4. Placement of blacks was said to have been in "staging areas" (Robertson Depo. at 58) rather than directly in more skilled positions.

5. There was some evidence of disparate treatment in a minimum of six cases briefly outlined at trial, most notably where black applicants sought employment in all-white job categories, such as secretaries. Tr. at 65–230; Plaintiff's Exhs. 27a–r, 28a–r.[4]

6. Most significantly, an intentional use of a 10% ceiling on black employment was shown, apparently instituted because of a mistaken view that racial "balance," regardless of other application and employment factors, was required to avoid "reverse discrimination." [5]

---

**3.** Defendant urges the Court to reject post-litigation evidence, citing, *e. g., Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 425 (8th Cir. 1970); *cf., United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 945 (10th Cir. 1979); *EEOC v. Westinghouse Corp.*, 592 F.2d 484, 487 (8th Cir. 1979) (relief for post-complaint discriminatees). But *Parham* merely holds that conduct after a complaint is filed cannot be used to obtain exoneration. Speeders often slow down after seeing a police car. Proof of post-complaint violations, on the other hand, is highly probative and is especially pertinent in a case, like the present one, alleging a continuing pattern and practice of discriminatory hiring.

**4.** Testimony and documents regarding particular applicants need not be fully analyzed in this opinion, other than to say that a prima facie case of pattern and practice was shown; the individual events simply give added weight to plaintiff's proof of statistical patterns. *Teamsters v. United States*, 431 U.S. 324, 359–61, 97 S.Ct. 1843, 1866–67, 52 L.Ed.2d 396 (1977). The Court does note, however, the strong showing of disparate treatment of certain potential claimants. For example, Denise Fulks applied for a position of keypunch operator, on two occasions approximately a year apart. On the first occasion, she was told the company was not hiring; on the second, that the position had been filled. Tr. at 184–98. However, defendant's personnel assistant at the time of the first application (Saunders; later Director of Personnel, Tr. at 714, 725–27) testified that seven people were hired during that time period. The only negative factor she attributed to Fulks was "poor job stability." Tr. at 740–45. One of the white applicants who was hired had nearly identical "instability" shown. Tr. at 969–70; Plaintiff's Exhs. 27b and 28b–c.

Sandra Hayes was a black applicant for the position of secretary. She was told her typing score was very good but that vocabulary and aptitude test scores were too low for a secretarial position. An offer of a clerk-typist job was made which she refused. Tr. at 213–20. Her tests scores were identical to, with the exception of typing speed, which was one point higher than, the person who was hired. Tr. at 854–55; Plaintiff's Exhs. 27b, 28k–1.

Levita Moore applied for a clerical position. Tr. at 82–94, 855. One white applicant who was hired a month later had lower typing speed by ten words per minute (Saunders agreed that Moore's typing was good) and Saunders stated that from the records she "had no idea" why that person would be hired instead of Moore. Tr. at 862–63; Plaintiff's Exhs. 27m, 28m–n.

**5.** Ever since the concept was first expressed by Justice Hughes in 1914, it has been a fundamental theory of civil rights protection that the essence of the right is a "personal one"; "(i)t is the individual who is entitled to the equal protection of the laws" rather than groups of people as such. *McCabe v. Atchison, Topeka & Santa Fe Railway Company*, 235 U.S. 151, 161–2, 35 S.Ct. 69, 71, 59 L.Ed. 169 (1914); *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948); *Palmer v. Thompson*, 403

The ceiling imposed, although the application ratio considerably exceeded 10%, necessarily resulted in the turning away of an unusually and disproportionately high percentage of black applicants after 10% was reached. Tr. at 932, 1006–08; Tr. at 359–609 and exhibits admitted therein; Defendant's Exh. 21.

Contrary to the recruitment policy asserted by defendant, there was in fact some evidence of avoidance of newspaper advertising directed toward the black community while advertising in local newspapers primarily directed toward readers in the white community, and segments thereof, but it is difficult to determine the effect of this practice.

Plaintiff contends that Riss used unvalidated testing devices which would appear to have no relation to suitability for employment (apart from those such as typing for particular clerical positions). There has been no showing, however, that blacks did more poorly on those tests than whites. The tests will not be considered as an independent basis for liability,[6] although they may be dealt with in devising remedies.

## IV.

In accordance with the above Memorandum Opinion, an order will be entered finding defendant liable on both the issue of discriminatory discharge of Mario Fort and a pattern and practice of discriminatory hiring. That pattern and practice had not abated through the date of the trial, and this ruling will justify prospective relief by way of injunction. While it is possible that some extent of quota relief based on application rates may also be justified (subject to the restriction that applicants be qualified for the work, a restriction which, based on the evidence, would bar no greater percentage of blacks than whites in most positions), it is not likely that this general ruling can subsequently be applied to resolve individual claims not yet fully asserted. While the individual testimony at trial brings to life the statistics upon which part of plaintiff's case rests, that testimony is not such as that which would fully establish

---

U.S. 217, 271, 91 S.Ct. 1940, 1968, 29 L.Ed.2d 438 (1971-dissent by Justice Marshall). Where there have been apparent departures from this principle, as in the establishment of quota systems targeted at the achievement of group representation in the work force, this has been explained as a "temporary tool." "In order to get beyond racism, we must first take account of race." Blackmun, J., in his separate opinion in *University of California Regents v. Bakke*, 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 (1978). The group of Justices with whom Justice Blackmun joined assumed the illegality of "deliberately maintaining a particular racial composition in (the) work force as an end in itself." Ibid., 342 n. 17, 98 S.Ct. 2774 n. 17 (Brennan opinion). See also Justice Blackmun's concurring opinion in *United Steelworkers of America v. Weber*, 443 U.S. 193, 216, 99 S.Ct. 2721, 2734, 61 L.Ed.2d 480 (1979). Defendant cites no Federal court ruling that an effort to bolster and maintain the white majority in a work force at a particular level, consistent with some "reasonable" or "normal" standard, is anything other than a plain violation of civil rights statutes and basic safeguards of individual rights when such a policy causes rejection of the application of a black person because of race. Quotas cannot be transmuted into ceilings, at least in the employment context. See, e. g., *Bailey v. Ryan Stevedoring Co., Inc.*, 613 F.2d 588, 590 (5th Cir. 1980) (employ-

er's hiring rule of maintaining a 50%–50% balance of blacks and whites, half from each segregated union, "represented a real threat of discriminatory treatment"). Compare the Eighth Circuit's use of racial ceilings in school cases, as an expedient to prevent resegregation. *Adams v. United States*, 620 F.2d 1277, 1296 (8th Cir. 1980); *United States v. School District of Omaha*, 521 F.2d 530, 547 (8th Cir. 1975), cert. den. 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975).

6. Any "adverse impact" theory would be based on the totality of factors in the selection process, which included a great deal of subjective evaluation such as "personality" or ability to "mix in." See *Hameed v. Iron Workers*, 637 F.2d 506, 512 (8th Cir. 1980); cf., *Harris v. Ford Motor Co.*, 651 F.2d 609, 611 (8th Cir. 1981). However, it would appear that, since the 10% cap was placed on hiring and the 10% was filled with black applicants, the impact of the selection process cannot be separated from the intentional discrimination. It may only have determined *which* blacks would constitute the 10% total. Again, fashioning remedies may be the more appropriate place to address this selection process since, once the intentional limitation is removed, such factors should not be allowed to adversely affect future applicants.

liability for individual relief. The evidence does not permit a "bright line" ruling. There was no flat or general prohibition against employing blacks; it was simply more difficult to obtain employment if you were black. Contrast, *EEOC v. Cook Paint, supra* (systematic exclusion of women from portions of the work force).

Plaintiff suggests that a classwide back pay remedy may now be entered, based on "limited additional discovery," and that such an award will avoid much " 'complexity and uncertainty,' " quoting from Chief Judge Lay's opinion in *Hameed*, supra, 637 F.2d at 520. Judge Bright would, however, have left to the district court the choice between a class-based remedy and an individualized remedy. Ibid., 525. Where possible, an individualized remedy should be utilized. Ibid., 519. It is by no means clear that classwide back pay can be ordered in this case with comparative ease, as well as fairness. Rather than give further remedial directions at this time, the Court must ask counsel to carefully review possible procedures for devising a back pay award under the discriminatory hiring ruling, and to submit specific proposals for further back pay proceedings. It may be anticipated that this may be the most controversial aspect of completion of the litigation.

The parties should attempt to agree more expeditiously as to the scope and form of any relief which, pursuant to this opinion, may be readily and promptly entered. To effectuate relief in such a manner, proceedings will be ordered in stages with a view toward disposing of as many remedial issues as possible by agreement and without further delay. Accordingly, it is hereby

ORDERED that judgment in favor of plaintiff and intervenor and against defendant as to liability is hereby granted. It is further

ORDERED that the parties shall comply with the following schedule as to remedial proceedings:

1. Within thirty (30) days of the date of this Order, the parties shall meet, confer and attempt to agree on all remedial measures appropriate to redressing the claim of the intervenor, Mario Fort, and shall within forty-five (45) days of the date of this Order, file a stipulation to the extent that any measures are agreed, with separate filings and briefing of any issues of relief for the intervenor which cannot be resolved by agreement. If a hearing is necessary to resolve any issues of fact relating to the extent of relief for the intervenor, the filings shall so state and specifically set out proposed findings of fact and the basis for contesting that fact. No extension of time as to this portion of remedial proceedings will be granted.

2. Within forty (40) days of the date of this Order, the parties shall meet, confer and attempt to agree on general injunctive and other general equitable relief (not including possible individual claims for back pay, priority hiring, retroactive seniority, or other individualized relief to particular claimants), including the extent and nature of any injunction as to hiring, application procedure and reporting requirements, and retention of jurisdiction. The parties shall, within sixty (60) days of the date of this Order, file a stipulation as to any agreed measures, with separate filings and briefing of any issues of fact or law which cannot be agreed as to this facet of relief. If a hearing is necessary to resolve any issues of fact relating to this type of relief, the filings shall so state and specifically set out proposed findings of fact and the basis for contesting that fact.

3. Within sixty (60) days of the date of this Order, the EEOC shall file proposed procedures for handling any individual claimants' relief, together with supporting authorities. Defendant shall respond within fourteen (14) days of the date of the EEOC filing, and any reply which EEOC may wish to file should be submitted within ten (10) days after defendant's response.

Any requests for extensions of time as to the proceedings outlined in paragraphs (2) and (3) should be accompanied by specific statements of the progress of those proceedings and the need for the extension.